ATLANTIC REFINING CO. ET AL. *v.* PUBLIC SERV-
ICE COMMISSION OF NEW YORK ET AL.

No. 518.   Argued May 20–21, 1959.—Decided June 22, 1959.*

*Together with No. 536, *Tennessee Gas Transmission Co.* v. *Public
Service Commission of New York et al.,* also on certiorari to the
same Court.

*David T. Searls* argued the cause for petitioners in No. 518. With him on a brief for petitioners were *Roy W. Johns, Charles B. Ellard* and *Bernard A. Foster, Jr.* for Atlantic Refining Co., *Gene M. Woodfin* for Continental Oil Co., *Gentry Lee* and *Bernard A. Foster, Jr.* for Cities Service Production Co., *Robert O. Koch* and *Gene M. Woodfin* for Tidewater Oil Co.

*Harry S. Littman* argued the cause for petitioner in No. 536. With him on the brief were *William C. Braden, Jr.* and *Jack Werner.*

*Kent H. Brown* argued the causes for the Public Service Commission of the State of New York, respondent. With him on the brief was *George H. Kenny.*

*Edward S. Kirby* argued the cause for the Public Service Electric & Gas Co., respondent. With him on a joint brief for that Company and the Long Island Lighting Co., respondents, were *David K. Kadane* and *Bertram D. Moll.*

*Willard W. Gatchell, Howard E. Wahrenbrock* and *William W. Ross* filed a brief for the Federal Power Commission as *amicus curiae.*

MR. JUSTICE CLARK delivered the opinion of the Court.

This proceeding tests the jurisdiction, as well as the discretion, of the Federal Power Commission in the certificating of the sale of natural gas under § 7 (e) of the Natural Gas Act of 1938, 52 Stat. 821, 56 Stat. 84, as amended, 15 U. S. C. § 717 *et seq.*[1] The Commission has issued a certificate of public convenience and necessity to petitioners, producers of natural gas,[2] to sell to petitioner Tennessee Gas Transmission Co. 1.67 trillion cubic feet of natural gas at an initial price of 22.4 cents per MCF,

---

[1] Section 7 (e), 15 U. S. C. § 717f (e), provides:

"(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

[2] These are the Atlantic Refining Company, Cities Service Production Company, Continental Oil Company, and Tidewater Oil Company, all petitioners in No. 518 and sometimes known as CATCO.

including a tax of 1 cent per MCF. *Continental Oil Co.,* 17 F. P. C. 880. In the same proceeding and on the same evidence it had twice refused to issue such an unconditional certificate because of insufficient evidence or testimony "on which to base a finding that the public convenience and necessity requires the sale of these volumes of gas at the particular rate level here proposed." On the second occasion it proposed to petitioners that the certificates be conditioned upon an initial price of 18 cents per MCF (including the 1-cent tax), to be increased to 22.4 cents per MCF (including the 1-cent tax) after the first 24-hour delivery period, the latter rate to be subjected to the "just and reasonable" provisions of § 4 of the Act, 15 U. S. C. § 717c. The petitioners refused this proposal, and Tennessee advised the Commission that unless the certificates were issued without such conditions, CATCO would not dedicate its gas to the interstate market. Upon rehearing, after argument but without additional evidence, the Commission issued the certificates declaring "important as is the issue of price, that as far as the public is concerned, the precise charge that is made initially is less important than the assurance of this great supply of gas" for interstate markets. 17 F. P. C., at 881.

The respondents, other than the Public Service Commission of the State of New York, are public utilities in New York and New Jersey. They buy gas from petitioner Tennessee for distribution in those States. They and the New York Commission oppose the issuance of the certificates on the ground that their issuance will increase the price of gas to consumers in those States, of whom there are over a million, using Tennessee's gas. Upon the issuance of the certificates the respondents filed petitions for review with the Court of Appeals. It held that "Congress has not given the Commission power to inquire into the issue of public convenience and necessity where, as

here, the applicant circumscribes the scope of that inquiry by attaching a condition to its application requiring the Commission to forego the consideration of an element which may be necessary in the formulation of its judgment." *Public Service Comm'n of N. Y.* v. *Federal Power Comm'n*, 257 F. 2d 717, 723. Concluding that the Commission had no jurisdiction to conduct such "a *limited* inquiry," *ibid.*, it vacated the order granting the certificates and remanded the case to the Commission. The importance in the administration of the Act of the questions thus posed required the granting of certiorari, 358 U. S. 926 (1959). We have concluded that the Court of Appeals was in error in deciding that the Commission had no jurisdiction. However, for reasons hereafter developed we hold that the order of the Commission in granting the certificates was in error and we, therefore, affirm the judgment of the Court of Appeals.

The natural gas involved here is of a Miocene sand located below seabed out in the Gulf of Mexico some 15 to 25 miles offshore from Cameron and Vermilion Parishes, Louisiana. The petitioners in No. 518 are each independent natural gas producers. They jointly own oil and gas leases (25% to each company) which they obtained from Louisiana covering large acreages of the Continental Shelf off the Louisiana coast. Jurisdiction over the Continental Shelf is claimed by the United States and the question is now in litigation. The Congress has continued existing leases in effect pending the outcome of the controversy over the title. 67 Stat. 462, 43 U. S. C. (Supp. I, 1954) §§ 1331–1343. The four companies' joint venture has resulted in the discovery of huge fields of natural gas and they have dedicated some 1.75 trillion cubic feet of gas from 95,000 acres of their leases to the petitioner Tennessee Gas Transmission Company, a natural gas company subject to the jurisdiction of the

Commission.[3] The latter is the petitioner in No. 536 which has been consolidated with No. 518.

The four contracts dedicating the gas to Tennessee run from each of the petitioner producers. The contracts call for an initial price of 22.4 cents per MCF for the gas, including 1-cent tax, with escalator clauses calling for periodic increases in specific amounts.[4] In addition, they provide for Tennessee to receive the gas at platforms on the well sites out some 15 to 25 miles in the Gulf. This requires it to build approximately 107 miles of pipeline from its nearest existing pipeline point to the offshore platforms at wellhead. The estimated cost was $16,315,412. It further appears that the necessity for the certificates was based on an application of Tennessee, Docket G-11107, in which Tennessee requested certification to enlarge and extend its facilities. This program included the building of a pipeline from southeast Louisiana to Portland, Tennessee, which would carry a large proportion of the gas from these leases. Its cost was estimated at $85,000,000. In addition the contracts provide that Tennessee give free carriage from the wells to the shore of all condensate or distillate in the gas for the account of producers who have the option to separate it from the gas at shore stations. We need not discuss the contract provisions more minutely, though respondents do claim that

---

[3] Tennessee operates a pipeline system extending from gas fields in Texas and Louisiana through Arkansas, Mississippi, Tennessee, Kentucky, West Virginia, Ohio, Pennsylvania, New Jersey, New York and into Massachusetts, New Hampshire, Rhode Island and Connecticut. It serves some 80 distributing companies which in turn serve millions of consumers in the various States which its pipeline traverses.

[4] These increases were later limited to 2 cents per MCF. The escalator clauses apparently were inserted in lieu of "favored nation" clauses, but by letter, not a part of the contracts, "favored nation" clauses were to be substituted at a later date on certain contingencies.

other requirements place a greater burden on Tennessee and in practical effect increase the stated price of the gas to it.

The Presiding Examiner on March 29, 1957, found that the sales were required by the public convenience and necessity. *Continental Oil Co.,* 17 F. P. C. 563. While he found that the proposed price was higher than any price Tennessee was then paying, he pointed to other prices currently paid for onshore sales "for smaller reserves and smaller future potentials." *Id.,* at 571. The average weighted cost of gas to Tennessee he found would be increased, if the contract price was certificated, by .97 cent per MCF.[5] However, he said that no showing had been made that this would lead to an increase in Tennessee's rates to jurisdictional customers or result in an increase in the price governing its other purchases. He refused to condition the certificates on the acceptance of a lower price by the parties on the ground that no "showing of imprudence or of abuse of discretion by management," *ibid.,* had been made that indicated the proposed price could not be accepted temporarily as consistent with the public convenience and necessity, pending review in a § 5 (a) proceeding. However, he did condi-

---

[5] The exact finding is as follows:

"Including the gas which Tennessee proposes to purchase under these contracts, some 240,000 M. c. f. per day (14.73 p. s. i. a.), it is estimated that the weighted average cost of all gas to Tennessee in 1958 will be some 13.70 cents per M. c. f., as compared with 12.73 cents if the gas here proposed to be purchased is excluded." 17 F. P. C. 563, 570.

Thus is the .97-cent figure derived. It is, however, a misleading figure, for the estimate for 1958 includes the 22.4-cent gas for only two months of 1958, November and December. There is no indication in the record as to what the cost increase would be if the weighted average were calculated by including the 22.4-cent gas for the full year.

tion his recommendation on the approval of Tennessee's application in Docket G–11107 above mentioned.

The Commission, as we have indicated, took three strikes at the recommendations of the Examiner. On April 22 it reversed his finding on public convenience and necessity because the evidence was insufficient as to price. It said:

> "The importance of this issue in certificating this sale cannot easily be overemphasized. This is the largest reserve ever committed to one sale. This is the first sale from the newly developed offshore fields from which large proportions of future gas supplies will be taken. This is the highest price level at which the sale of gas to Tennessee Gas has been proposed.
>
> "These factors make it abundantly evident that, in the public interest, this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest." *Id.*, at 575.

The Commission granted petitioners temporary certificates and remanded the proceeding to the Examiner "to determine at what rates the public convenience and necessity requires these sales" of natural gas to Tennessee under a permanent certificate. *Id.*, at 576. The producers immediately moved for modification, asserting that they could not present sufficient evidence "within any reasonable period in the future" to meet the necessities of the remand and, further, could not "afford to commence construction until at least the initial rate [question] is resolved." The Commission on May 20, however, reiterated its belief that "the record does not contain sufficient evidence on which to base a finding that the public convenience and necessity requires the sale of the gas at that particular rate level." 17 F. P. C. 732, 733–734. In an

effort to ameliorate the situation represented by the producers, the Commission did grant the certificates but conditioned them upon the producers'-acceptance of an initial price of 17 cents per MCF (plus the 1-cent tax), which was the highest price theretofore paid by Tennessee in the Southwest. It also agreed that one day after the commencement of deliveries of gas the 17-cent price would be escalated to 21.4 cents (plus 1 cent for taxes), the increase to be collected under bond, subject to proof and refund under the provisions of § 4 of the Act. This time Tennessee sought rehearing advising the Commission that the producers would not accept the 17-cent initial price order of May 20 and that "the contracts will be terminated" with the consequent "loss of natural gas supplies" required for Tennessee's customers. The Commission, after oral argument, did not withdraw its previous findings in the matter but predicated its third order on "the primary consideration that the public served through the Tennessee Gas system is greatly in need of increased supplies of natural gas. . . . In view of these circumstances and the fact that the record does not show that the 21.4-cent [plus 1 cent for taxes] rate is necessarily excessive, we agree with the presiding examiner that this certificate proceeding . . . should not assume the character of a rate proceeding under Section 5 (a)." 17 F. P. C. 880, 881. Asserting that it was of the opinion that it would be able "to adequately protect the public interest with respect to the matter of price," *ibid.*, it ordered the certificates issued and directed that since the price "is higher than Tennessee Gas is paying under any other contract, it should be subject to prompt investigation under Section 5 (a) as to its reasonableness." *Id.*, at 882.

We note that the Commission did not seek certiorari here but has filed a brief *amicus curiae.*[6] It does not urge

---

[6] The brief is not signed by the Solicitor General but by both the General Counsel and the Solicitor of the Federal Power Commission.

reversal of the judgment but attacks the ground upon which the Court of Appeals bottomed its remand, namely, lack of Commission jurisdiction to consider the limited proposal of petitioners. The Commission's brief suggests that the Court not reach the issue tendered by petitioners, *i. e.*, must the Commission, in a § 7 proceeding, decide whether the proposed initial rate is just and reasonable? Instead, the Commission says, if the judgment must be affirmed it would be better to base the affirmance on the ground that its order "was not supported by sufficient evidence, and hence constituted an abuse of discretion in the circumstances of the particular case . . . ." Brief for the Federal Power Commission, p. 31. Petitioners oppose such a disposition, contending the evidence was quite substantial.

## I. JURISDICTION OF THE COMMISSION.

The Court of Appeals thought that the Commission had no jurisdiction to consider petitioners' proposal because it was limited to a firm price agreed upon by the parties applicant. Their refusal to accept certification at a lower price, even to the extent of canceling their contracts and withholding the gas from interstate commerce, the court held, resulted in the Commission's losing jurisdiction. We do not believe that this follows. No sales, intrastate or interstate, of gas had ever been made from the leases involved here. The contracts under which the petitioners proposed to sell the gas in the interstate market were all conditioned on the issuance of certificates of public convenience and necessity. A failure by either party to secure such certificates rendered the contracts subject to termination. Certainly the filing of the application for a certificate did not constitute a dedication to the interstate market of the gas recoverable under these leases. Nor is there doubt that the producers were at liberty to refuse conditional certificates proposed by

the Commission's second order. While the refusal might have been couched in more diplomatic language, it had no effect on the Commission's power to act on the rehearing requested. Even though the Commission did march up the hill only to march down again upon reaching the summit we cannot say that this about-face deprived it of jurisdiction. We find nothing illegal in the petitioners' rejection of the alternative price proposed by the Commission and their standing firm on their own.

## II. THE VALIDITY OF THE ORDER.

The purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas. *Federal Power Comm'n.* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944). As the original § 7 (c) provided, it was "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." 52 Stat. 825.[7] The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges. The heart of the Act is found in those provisions requiring initially that any "proposed service, sale, operation, construction, extension, or acquisition . . . will be required by the present or future public convenience and necessity," § 7 (e), 15 U. S. C. § 717f (e), and that all rates and charges "made, demanded, or received" shall be "just and reasonable," § 4, 15 U. S. C. § 717c. The Act prohibits such movements unless and until the Commission

---

[7] The 1942 amendments to § 7, 56 Stat. 83, were not intended to change this declaration of purpose. See Hearings, House Interstate and Foreign Commerce Committee, on H. R. 5249, 77th Cong., 1st Sess. 18–19; H. R. Rep. No. 1290, 77th Cong., 1st Sess.; S. Rep. No. 948, 77th Cong., 2d Sess.

issues a certificate of public convenience and necessity therefor, § 7 (c), 15 U. S. C. § 717f (c). Section 7 (e) vests in the Commission control over the conditions under which gas may be initially dedicated to interstate use. Moreover, once so dedicated there can be no withdrawal of that supply from continued interstate movement without Commission approval. The gas operator, although to this extent a captive subject to the jurisdiction of the Commission, is not without remedy to protect himself. He may, unless otherwise bound by contract, *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp.,* 350 U. S. 332 (1956), file new rate schedules with the Commission. This rate becomes effective upon its filing, subject to the 5-month suspension provision of § 4 and the posting of a bond, where required. This not only gives the natural gas company opportunity to increase its rates where justified but likewise guarantees that the consumer may recover refunds for moneys paid under excessive increases. The overriding intent of the Congress to give full protective coverage to the consumer as to price is further emphasized in § 5 of the Act, 15 U. S. C. § 717d, which authorizes the Commission *sua sponte,* or otherwise, to institute an investigation into existing rates and charges and to fix them at a just and reasonable level. Under this section, however, the rate found by the Commission to be just and reasonable becomes effective prospectively only. Gas purchasers, therefore, have no protection from excessive charges collected during the pendency of a § 5 proceeding.

In view of this framework in which the Commission is authorized and directed to act, the initial certificating of a proposal under § 7 (e) of the Act as being required by the public convenience and necessity becomes crucial. This is true because the delay incident to determination in § 5 proceedings through which initial certificated rates are reviewable appears nigh interminable. Although

*Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, was decided in 1954, cases instituted under § 5 are still in the investigative stage. This long delay, without the protection of refund, as is possible in a § 4 proceeding, would provide a windfall for the natural gas company with a consequent squall for the consumers. This the Congress did not intend. Moreover, the fact that the Commission was not given the power to suspend initial rates under § 7 makes it the more important, as the Commission itself says, that "this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest." 17 F. P. C. 563, 575.

This is especially true where, as here, the initial price will set a pattern in an area where enormous reserves of gas appear to be present. We note that in petitioners' proof a map of the Continental Shelf area off of the coast of Louisiana shows that the leases here involved cover but 17 out of a blocked-out area covering some 900 blocks of 5,000 acres each. The potential of this vast acreage, in light of discoveries already made as shown by the record, is stupendous. The Commission has found that the transaction here covers the largest reserve ever committed to interstate commerce in a single sale. Indications are that it is but a puff in comparison to the enormous potentials present under the seabed of the Gulf. The price certificated will in effect become the floor for future contracts in the area. This has been proven by conditions in southern Louisiana where prices have now vaulted from 17 cents to over 23 cents per MCF. New price plateaus will thus be created as new contracts are made and unless controlled will result in "exploitation" at the expense of the consumer, who eventually pays for the increases in his monthly bill.

It is true that the Act does not require a determination of just and reasonable rates in a § 7 proceeding as it does in one under either § 4 or § 5. Nor do we hold that a

"just and reasonable" rate hearing is a prerequisite to the issuance of producer certificates. What we do say is that the inordinate delay presently existing in the processing of § 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7. Their proposals must be supported by evidence showing their necessity to "the present or future public convenience and necessity" before permanent certificates are issued. This is not to say that rates are the only factor bearing on the public convenience and necessity, for § 7 (e) requires the Commission to evaluate all factors bearing on the public interest. The fact that prices have leaped from one plateau to the higher levels of another, as is indicated here, does make price a consideration of prime importance. This is the more important during this formative period when the ground rules of producer regulation are being evolved. Where the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued.

There is, of course, available in such a situation, a method by which the applicant and the Commission can arrive at a rate that is in keeping with the public convenience and necessity. The Congress, in § 7 (e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of "favored nation" clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary.

This is not an encroachment upon the initial rate-making privileges allowed natural gas companies under the

Act, *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp., supra,* but merely the exercise of that duty imposed on the Commission to protect the public interest in determining whether the issuance of the certificate is required by the public convenience and necessity, which is the Act's standard in § 7 applications. In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate. Thus the purpose of the Congress "to create a comprehensive and effective regulatory scheme," *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n of Indiana,* 332 U. S. 507, 520 (1947), is given full recognition. And § 7 is given only that scope necessary for "a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission . . . ." *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp., supra,* at 341. On the other hand, if unconditional certificates are issued where the rate is not clearly shown to be required by the public convenience and necessity, relief is limited to § 5 proceedings, and, as we have indicated, full protection of the public interest is not afforded.

Our examination of the record here indicates that there was insufficient evidence to support a finding of public convenience and necessity prerequisite to the issuance of the permanent certificates. The witnesses tendered developed little more information than was included in the printed contracts. As the proposed contract price was higher than any paid by Tennessee, including offshore

production in the West Delta area of Louisiana, it is surprising that evidence, if available, was not introduced as to the relative costs of production in the two submerged areas. Moreover the record indicates that the proposed price was some 70% higher than the weighted average cost of gas to Tennessee; still no effort was made to give the "reason why." More damaging, was the evidence that this price was greatly in excess of that which Tennessee pays from any lease in southern Louisiana. Likewise the $16,000,000 pipeline to the producers' wells was unsupported by evidence of practice or custom. Respondents contend—and it stands undenied—that this alone would add 2 cents per MCF to the cost of the gas. Again the free movement f distillates retained by the producers was "shrugged off" as being *de minimis*, without any supporting data whatever. Nor was the evidence as to whether the certification of this price would "trigger" increases in leases with "favored nation" clauses convincing, and the claim that it would not lead to an increase in rates by Tennessee was not only unsupported but has already proven unfounded.[8]

Nor do we find any support whatever in the record for the conclusory finding on which the order was based that "the public served through the Tennessee Gas system is greatly in need of increased supplies of natural gas." 17 F. P. C. 880, 881. Admittedly any such need was wrapped up in the Commission's action in Docket G–11107, where Tennessee was asking for permission to enlarge its facilities. However, the two dockets were not consolidated and the Presiding Examiner conditioned his approval here on the granting of the application in Docket G–11107, no part of which record is here. Neither is

---

[8] Tennessee has subsequently filed an application with the F. P. C. requesting higher rates designed to produce some $19,000,000 additional annual revenue. *Tennessee Gas Transmission Co.*, Docket G–17166.

there evidence supporting the finding that the producers "would seek to dispose of their gas elsewhere than to Tennessee Gas and the interstate market," *ibid.* While the Commission says that statements were made in argument, apparently by counsel, that this was the case, we find no such testimony. Since some 90% of all commercial gas moves into the interstate market, the sale of such vast quantities as available here would hardly be profitable except interstate.

These considerations require an affirmance of the judgment with instructions that the applications be remanded to the Commission for further proceedings.

*It is so ordered.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER joins, concurring.

I agree with the judgment of the Court on the ground that the findings upon which the Commission based its conclusion that the public convenience and necessity required the issuance to petitioners of unconditional final certificates find no support in the record. There is no evidence supporting what appear to be the crucial findings that (1) "the public served through the Tennessee Gas system is greatly in need of increased supplies of natural gas," particularly insofar as this finding implies that this need is immediate and cannot be satisfied from Tennessee's existing reserves, and that (2) there was serious danger that producer petitioners' gas would be permanently lost to the interstate market unless an unconditional certificate were granted on their terms. This makes it unnecessary to consider at this stage any of the other questions sought to be presented by the parties.