FEDERAL POWER COMMISSION *v.* HUNT ET AL.

No. 273.  Argued March 2, 1964.—Decided March 30, 1964.

*Richard A. Solomon* argued the cause for petitioner. With him on the brief were *Solicitor General Cox, Ralph S. Spritzer, Howard E. Wahrenbrock* and *Peter H. Schiff.*

*Richard F. Generelly* argued the cause for respondents. With him on the brief were *Robert W. Henderson, Thomas G. Crouch* and *Robert E. May.*

MR. JUSTICE CLARK delivered the opinion of the Court.

The issue in this case is whether the Federal Power Commission, when granting an application for a temporary certificate authorizing the sale of natural gas in interstate commerce, can impose a condition that the applicant shall not increase its certificated price pending a hearing on the applicant's petition for permanent authority.  Each of the seven applications involved here requested temporary operating authority to sell natural gas in interstate commerce on emergency grounds, as provided by §§ 7 (c) and (e) of the Natural

Gas Act.[1]  In each case the Federal Power Commission conditioned the temporary grant of authority upon, *inter alia,* the producer's maintaining the initial price, without

[1] Section 7 (c), 52 Stat. 824, as amended, 56 Stat. 83, 15 U. S. C. § 717f (c), provides:

"(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on . . . [February 7, 1942], over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after . . . [February 7, 1942].  Pending the determination of any such application, the continuance of such operation shall be lawful.

"In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest."

Section 7 (e), 52 Stat. 824, as amended, 56 Stat. 84, 15 U. S. C. § 717f (e), provides:

"(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any

increase, during the period of the temporary authorization. On appeal, the Court of Appeals set aside this condition, holding that it was beyond the power of the Commission and conflicted with the right of a producer to initiate a higher contract rate under § 4 of the Act. 306 F. 2d 334. We granted certiorari because of the importance of the question to the enforcement of the Natural Gas Act. 375 U. S. 810. We conclude that the Commission can impose such a condition in granting temporary authorizations under § 7 and therefore reverse the judgments.

I.

While this case involves applications for seven different temporary authorizations, the essential facts as to each, save the dates and gas fields, are the same. Since the parties and the Court of Appeals have treated the sale by the Hassie Hunt Trust as typical, we shall do likewise.

The Hunts are producers of natural gas in the Alta Loma area in Galveston County in Texas Railroad District No. 3. In July 1960, the Commission issued a permanent certificate authorizing sales of natural gas from the Alta Loma and other areas to the Peoples Gulf Coast Natural Gas Pipeline Co. 24 F. P. C. 1. The authorization was conditioned upon the producer's filing

qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

an amended contract providing for an initial price of 20¢ per Mcf., with an escalation of 3¢ after 10 years. The original contract had allowed four 2¢ escalations at four-year intervals. The order was found defective, however, because the Public Service Commission of New York, which sought a lower initial price, had been refused intervention before the Commission. See *Public Service Comm'n* v. *Federal Power Comm'n,* 111 U. S. App. D. C. 153, 295 F. 2d 140, cert. denied, *sub nom. Shell Oil Co.* v. *Public Service Comm'n,* 368 U. S. 948. Thereafter the Commission vacated its issuance of the certificate and ordered a new hearing on the question of initial price. 26 F. P. C. 689.

In the meantime, after the issuance, but prior to the vacating, of the July 1960 certificate, the Commission issued General Policy No. 61–1, 18 CFR § 2.56, 24 F. P. C. 818, which fixed the guideline for initial prices for Texas Railroad District No. 3 at 18¢ per Mcf., 2¢ below the initial price allowed in the July 1960 certificate.

Thereafter, on February 27, 1961, the Hassie Hunt Trust applied for a permanent certificate of public convenience and necessity allowing sales from a new well in this same area to Natural Gas Pipeline Company of America, the successor to Peoples Gulf Coast. It also applied for temporary authorization to begin service immediately under the emergency provisions of the Commission's Regulations issued under § 7 (c) of the Act. 18 CFR § 157.28. The emergency was alleged to result from the "necessity of paying shut-in royalties and the incurrence of drainage through sales by others to pipeline companies other than Natural." The new sale was covered by a 20-year contract, dated December 15, 1960, with provisions identical to those of the earlier contract, *i. e.,* an initial price of 20¢ per Mcf. with 2¢ escalations at four-year intervals. The Commission on April 7, 1961, granted the temporary authorization subject to

three conditions: (1) that the total initial price not exceed 18¢ per Mcf. and thus be in keeping with the guideline rate set for Texas Railroad District No. 3, (2) that within 20 days supplements to the contracts be filed consistent with this price, and (3) that the temporary authorization be accepted in writing within 20 days. Deliveries were commenced by the producer on April 19 before these conditions were met. On May 5 a conditional acceptance was filed reserving the right to seek removal of the conditions imposed and tendering an amended contract providing for an 18¢ initial price for 30 days with 20¢ per Mcf. thereafter. The Commission rejected this conditional acceptance and subsequently, in order to make clear its position, specifically provided that the initial rate was to be 18¢ and that there was to be no change therein pending the hearing on permanent authorization. The proposed 20¢ rate was rejected and thereafter this review followed.

The Court of Appeals sustained the 18¢ initial price but held that the Commission had no power to condition temporary authorizations so as to preclude the filing and collection of increased rates pursuant to § 4 of the Act.

## II.

Once again we are confronted with a question solely of the proper interpretation of the Natural Gas Act. This time we must determine the interplay of §§ 4 and 7. These sections are the avenues through which the natural gas producer may, by contract or otherwise, initially propose the dedication of his natural gas supply to interstate movement (§ 7) and, once so dedicated by order of the Federal Power Commission, thereafter initiate changes in existing rates (§ 4). We will proceed with separate analyses of these two sections.

Section 7 (c) came into the Natural Gas Act in 1942 and provides the method by which gas may be dedicated

and certificated into interstate commerce. It prohibits a natural gas producer from engaging in the transportation or sale of natural gas "unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations." In order to secure such certificates, applications are filed with the Commission and in due course the applicants are afforded a hearing. Sections 7 (c) and (e) of the Act command that a certificate shall be issued if the Commission finds it "required by the present or future public convenience and necessity" and if the applicant meets certain tests of reliability, such as ability and willingness to perform. In issuing such certificates, the Commission has "the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." § 7 (e).

Hearings under § 7 (e) for permanent certification are time consuming. The Congress, realizing this, provided in § 7 (c) that "the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest." Pursuant to this authorization the Commission adopted a regulation which sets out standards for emergency authorizations and requires the applicant to file "a statement of intention to invoke this section." 18 CFR § 157.28 (c). The Commission grants the temporary certificate, where it deems necessary, without notice or hearing. Under the terms of the regulation, this authorization continues until final Commission action under §§ 4 and 7, "without preju-

dice to such rate or other condition as may be attached to the issuance of the certificate." 18 CFR § 157.28.

It must be noted, however, that § 7 does not stipulate that the Commission must find the initial rate to be just and reasonable but simply that the service proposed is required by the present and future public convenience and necessity. Nor does § 7 grant the Commission power to suspend the rate authorized in permanent or temporary certificates issued under that section. Once a permanent certificate is granted the Commission can correct an improper rate only under § 5 of the Act, 52 Stat. 823, 15 U. S. C. § 717d, which likewise has no suspension provision. In the light of this inability to suspend the initial rate granted under a § 7 certificate, the Commission attaches conditions to the certificate of authority which it deems necessary to afford consumers the "complete, permanent and effective bond of protection from excessive rates and charges" for which we found the Act was framed in *Atlantic Refining Co.* v. *Public Service Comm'n,* 360 U. S. 378, 388 (1959). "The heart of the Act," we said there, was in those provisions of § 7 (e) "requiring initially that any 'proposed service, sale, operation, construction, extension, or acquisition . . . will be required by the present or future public convenience and necessity' . . . and that all rates and charges 'made, demanded, or received' shall be 'just and reasonable,' § 4, 15 U. S. C. § 717c." In this case, the Commission concluded that when granting temporary certificates it must look even more carefully to the present and future public convenience and necessity and interpose such conditions precedent as would, in its view, fully protect consumers from excessive rates and charges.

Section 4 was included in the original Act of 1938. 52 Stat. 822, 15 U. S. C. § 717c. It provides in part that "no change shall be made by any natural-gas company in

any . . . rate . . . except after thirty days' notice to the Commission and to the public." § 4 (d). Whenever such new rate is filed, the Commission may, after notice, hold hearings to determine whether the rate is lawful and may suspend its operation, but only for a period of five months. § 4 (e). If the proceeding is not concluded within those five months, the proposed rate becomes effective and collectible, subject to subsequent refund by the natural gas company to the extent the rate is not just and reasonable. As we said in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U. S. 332, 341 (1956), the power granted to the Commission "is simply the power to review rates and contracts made in the first instance by natural gas companies and, if they are determined to be unlawful, to remedy them." And we specifically pointed out that all § 4 (e) does "is to add to this basic power, in the case of a newly changed rate . . . the further powers (1) to preserve the status quo pending review of the new rate by suspending its operation for a limited period, and (2) thereafter to make its order retroactive, by means of the refund procedure, to the date the change became effective." *Ibid.* The power granted to the Commission in § 4 does not come into play until after the initial certification of the natural gas into interstate commerce has been granted under § 7.

In the instant case no permanent certificates authorizing sales in interstate commerce have yet been issued. Temporary certificates have been allowed and each is conditioned upon the maintenance of the initial price. Thus, if respondents' position is correct, then the conditions precedent to the issuance of the temporary certificates required by the Commission can be nullified by subsequent independent action of the respondents in filing a new contract under § 4. We do not believe that the Congress intended any such incongruous result.

## III.

We find no conflict in the directives of the two sections. Indeed, they supplement one another and thereby work together in efficient conjunction to carry out the purposes of the Act. When the independent producer knocks on the door of the Commission for permission to enter his gas in interstate commerce he must submit to the requirements of § 7. His natural gas must be certificated before it can move into interstate commerce. If he wishes to avoid the delay incident to a hearing for a permanent certificate he may apply for temporary authorization, which may be granted upon *ex parte* application. In view of this, the Commission must have the authority to condition a temporary certificate so as to avoid irreparable injury to affected parties. This condition, once imposed, continues only during the pendency of the producer's application for a permanent certificate. In view of the *ex parte* nature of the proceeding, it appears only fair to all concerned that the condition upon which the rate was temporarily certified be continued unchanged until the permanent certificate is issued.

Under the procedures of the Act, it is at the point of permanent or unconditional temporary certification that the provisions of § 4 become applicable. The gas has been permanently certificated into interstate commerce and the independent producer is then free to pursue the rate-filing procedure of that section.

This Court previously discussed the use of the temporary certificate procedure in *Atlantic Refining Co.* v. *Public Service Comm'n, supra.* There we indicated that the Commission might avail itself of its power to condition the initial certification of natural gas into interstate commerce in order to prevent a triggering of general price rises. The language is unmistakably clear as to the

claim made here that the vitality of § 4 of the Act is being impaired and we therefore repeat and reaffirm it:

> "This is not an encroachment upon the initial rate-making privileges allowed natural gas companies under the Act, *United Gas Pipe Line Co.* v. *Mobile Gas Service Corp., supra,* but merely the exercise of that duty imposed on the Commission to protect the public interest in determining whether the issuance of the certificate is required by the public convenience and necessity, which is the Act's standard in § 7 applications. In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate." At 391–392.

Nor is it any answer to say that the suspension power under § 4 (e) will afford protection to the public. The experience since our opinion in *Atlantic Refining Co., supra,* indicates that a triggering of price rises often results from the out-of-line initial pricing of certificated gas. These effects become irreversible and splash over into intrastate sales, thus generating reciprocal pressures that directly affect jurisdictional rates. As we said in *Federal Power Comm'n* v. *Tennessee Gas Transmission Co.,* 371 U. S. 145, 154, 155 (1962), the possibility of refund does not afford sufficient protection:

> "True, the exaction would have been subject to refund, but experience has shown this to be somewhat illusory . . . . It is, therefore, the duty of the Commission to look at 'the backdrop of the practi-

cal consequences [resulting] . . . and the purposes of the Act,' *Sunray Mid-Continent Oil Co.* v. *Federal Power Comm'n,* 364 U. S. 137, 147 (1960), in exercising its discretion under § 16 to issue interim orders . . . ."

## IV.

Our interpretation of the power of the Commission under §§ 7 (c) and (e) is buttressed by the legislative history. They were added to the Act in 1942, four years after its original passage. Prior to their adoption the only rate-making regulatory tools the Commission possessed were §§ 4 and 5, and they came into operation only after the natural gas was already moving in interstate commerce. Sections 7 (c) and (e) were designed to control the certification of gas destined for interstate movement.[2] The purpose of the amendments was to give "the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure . . . at a time when such vital matters can readily be modified as the public interest may demand. . . ." House Committee on Interstate and Foreign Commerce, H. R. Rep. No. 1290, 77th Cong., 1st Sess., 2–3. Its counterpart in the Senate likewise reported:

"Provisions of the Natural Gas Act empower the Commission to prevent uneconomic extensions and waste, but it can so regulate such powers only when the extension is to 'a market in which natural gas is already being served by another natural-gas company.' Thus the possibilities of waste, uneconomic and uncontrolled extensions are multiple and tre-

---

[2] The Commission did have authority with reference to the entry of a natural gas company into a competitive market but not into new and unserviced markets.

mendous. The present bill would correct this glaring inadequacy of the act. It would also authorize the Commission to examine costs, finances, necessity, feasibility, and adequacy of proposed services. The characteristics of their rate structure could be studied." Senate Committee on Interstate Commerce, S. Rep. No. 948, 77th Cong., 2d Sess., 1–2.

Clearly, the Commission was given the power to lay down conditions precedent to the entry of the natural gas into interstate commerce. Moreover, the Commission has long recognized this obligation and has required modification of many tariff and contract provisions as a condition to the granting of a certificate.[3]

The existence of broad discretionary power in the Commission to condition temporary certificates appears to us to be vital to its ability to hold the line in pricing. The extent of that power in permanent certification is not before us now, since each of these applications is for temporary certification. It is said that the condition of the Commission's docket transposes, for all practical matters,

[3] See, e. g., *Florida Economic Advisory Council* v. *Federal Power Comm'n,* 102 U. S. App. D. C. 152, 251 F. 2d 643, cert. denied, 356 U. S. 959; *Northern Natural Gas Co.,* 22 F. P. C. 164, 174–175, 180, aff'd *sub nom. Minneapolis Gas Co.* v. *Federal Power Comm'n,* 108 U. S. App. D. C. 36, 278 F. 2d 870, cert. denied, 364 U. S. 891 (certificate conditioned upon removal of clauses permitting cancellation depending on price relationship of gas and competitive fuels in gas purchase contracts upon which feasibility of pipeline project depended); *Transwestern Pipeline Co.,* 22 F. P. C. 391, 394–395, modified on rehearing, 22 F. P. C. 542 (minimum bill provisions of proposed tariff required to be modified); *Panhandle Eastern Pipe Line Co.,* 10 F. P. C. 185 (conditions requiring inclusion of interruptible rate schedules in tariffs); *Trans-Continental Gas Pipe Line Co.,* 7 F. P. C. 24, 38–40 (commencement of service conditioned upon filing of new tariff satisfactory to Commission because of disapproval of certain terms of service); *Alabama-Tennessee Natural Gas Co.,* 7 F. P. C. 257 (commencement of service conditioned upon filing of tariff satisfactory to Commission).

temporary certificates into permanent ones. This claim arises due to the delays incident to the issuance of a permanent certificate. We spoke of the "nigh interminable" delay in § 5 proceedings in *Atlantic Refining Co.* v. *Public Service Comm'n, supra,* at 389. There delay operated against the consumer. Here it operates against the producer. The Commission has been making efforts in this regard, through the establishment of guidelines for determining initial prices and other administrative devices. 43 F. P. C. Ann. Rep. 13, 119–120 (1963). However, we again call to its attention the dangers inherent in the accumulation of a large backlog of cases with its accompanying irreparable injury to the parties. Moreover, consumers may become directly affected thereby through the reluctance of producers to enter interstate markets because of the long delay incident to permanent certification. Procedures must be worked out, not only to clear up this docket congestion, but also, to maintain a reasonably clear current docket so that hearings may be had without inordinate delay. In this connection the techniques of the National Labor Relations Board might be studied with a view to determining whether its exemption practices, see *Guss* v. *Utah Labor Relations Board,* 353 U. S. 1, 3–4 (1957), might be helpful in the solution of the Commission's problems.

*Reversed.*

Mr. Justice Harlan, whom Mr. Justice Stewart joins, dissenting.

While the result reached by the Court may be thought desirable, I can find no justification for it either in the Natural Gas Act or in any of the prior decisions of this Court. The matter is one for Congress. I would affirm the judgments below substantially for the reasons given by Judge Brown in his convincing opinion for the Court of Appeals. 306 F. 2d 334.