TENNESSEE GAS PIPELINE COMPANY, A DIVISION OF TENNECO, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Southern Natural Gas Company, Intervenor.

COLUMBIA GULF TRANSMISSION COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent, Tennessee Gas Pipeline Company, Southern Gas Pipeline Company, Intervenors.

Nos. 85–1644, 85–1710.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 24, 1986.

Decided July 24, 1987.

Gregory Grady, Washington, D.C., for Tennessee Gas Pipeline Co., petitioner in No. 85–1644 and intervenor in No. 85–1710. Dale A. Wright, Robert H. Benna, Douglas

O. Waikart and Terence J. Collins, Washington, D.C., were on the brief for Tennessee Gas Pipeline Co., petitioner in No. 85–1644 and intervenor in No. 85–1710.

Stephen J. Small and Richard Gottlieb, Charleston, W. Va., were on the brief for Columbia Gulf Transmission Co., petitioner in No. 85–1710.

Philip M. Marston, Atty., F.E.R.C., with whom Jerome M. Feit, Sol. and Joshua Z. Rokach, Atty., F.E.R.C., Washington, D.C., were on the brief for respondent in Nos. 85–1644 and 85–1710.

R. David Hendrickson and Donna J. Bailey, Birmingham, Ala., entered appearances for intervenor, Southern Natural Gas Co. in Nos. 85–1644 and 85–1710.

Before MIKVA and WILLIAMS, Circuit Judges, and PARSONS,* Senior District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

WILLIAMS, Circuit Judge:

Tennessee Gas Pipeline Company ("Tennessee") and Columbia Gulf Transmission Company ("Columbia Gulf") challenge two conditions imposed by the Federal Energy Regulatory Commission ("FERC") in certificates of public convenience and necessity under § 7(c) and (e) of the Natural Gas Act ("NGA"), 15 U.S.C. § 717f(c), (e) (1982). The certificates authorize the companies to provide transportation service through an offshore pipeline, but limit the transporters in two respects. First, they deny Tennessee's request for incremental pricing. Second, they authorize firm service for two shippers at a level far below those to which the shippers agreed in contracts with the transporters. For the reasons explained below, we uphold the Commission on the incremental pricing issue but not on the firm service issue.

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d).

## I. BACKGROUND

At issue is a 26–mile-long pipeline running from an offshore platform to Plaquemines Parish, Louisiana, known as SP77. Construction of SP77 was approved by FERC in 1980, *Tennessee Gas Pipeline Co.*, 12 F.E.R.C. (CCH) ¶ 61,307 (1980) (the "1980 Order"), and undertaken by Tennessee and Columbia Gulf, with financial participation from Gulf Oil Corporation.[1] Tennessee and Columbia Gulf planned to transport gas both for their own accounts and for the accounts of other companies with reserves in the area.

Tennessee and Columbia Gulf made arrangements with four such companies to transport gas and filed applications under § 7 for certificates of public convenience and necessity to authorize such service. In *Tennessee Gas Pipeline Co.*, 30 F.E.R.C. (CCH) ¶ 61,166 (1985) (the "1985 Order"), FERC authorized some, but not all, of the service sought and imposed various conditions. Tennessee and Columbia Gulf sought rehearing, *see Columbia Gulf Transmission Co.*, 32 F.E.R.C. (CCH) ¶ 61,407 (1985) (the "Order Denying Hearing"), and then petitioned for review in this court. After oral argument, we requested supplementary briefing; on receipt of the briefing, we ordered the record remanded to the Commission for additional factfinding and explanation. FERC responded to our order on March 11, 1987, *Tennessee Gas Pipeline Co.*, 38 F.E.R.C. (CCH) ¶ 61–238 (1987) (the "Order on Remand"), and the parties filed responses to it.

## II. INCREMENTAL V. AVERAGE-COST PRICING

Both Tennessee and Columbia Gulf sought permission from FERC to charge the shippers using SP77 on an incremental cost-of-service basis. In other words, they proposed to base charges for SP77 transportation on the cost of the offshore facility alone, rather than an average of the transportation costs of their entire systems. This would yield a higher rate than if pricing were done on a system-wide ba-

sis, as the unit costs of SP77 were higher than the transporters' average costs. FERC allowed Columbia Gulf to adopt incremental pricing, but refused to allow Tennessee to do so. It explained that Tennessee, unlike Columbia Gulf, had already included its share of the costs of SP77 in its system-wide rates under a settlement agreement and that permitting incremental pricing would result in double recovery.

■ Tennessee originally resisted the proposition that its system-wide rates included SP77 costs, but in the face of FERC's explanation in its Order on Remand conceded the point. Response of Tennessee Gas Pipeline Company to Order on Remand at 3. It now argues that this inclusion of these rates provides no assurance that it will actually recover its costs, since cost recovery depends on actual service levels. *Id.* at 4. This is, of course, also true of rates established under §§ 4 and 5 of the Natural Gas Act, 15 U.S.C. §§ 717c, 717d (1982), but it in no way undermines the validity of those rates.

■ Of course, business may have been disappointing for Tennessee since the last general rate case. But nothing in the structure of the NGA suggests that the Commission should use § 7 as a device for mid-course corrections of rates established under §§ 4 and 5, as Tennessee appears to suppose. Indeed, in *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120 (D.C.Cir.1979), *cert. denied*, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), the Commission attempted such a mid-course correction, conditioning certification of new service on the pipeline's crediting the resulting revenues (less out-of-pocket costs) to other customers, effectively reducing their rates. FERC sought to justify the condition by assertions that otherwise the pipeline would enjoy overrecovery. This court invalidated the condition, explaining that such tampering suffered a variety of defects, including that it wrongly disturbed the rate stability that Congress sought to

---

1. Gulf provided additional financing for the project and was to receive the right to use 25 percent of the capacity of SP77 for its own reserves. The remaining 75 percent was to be divided between Tennessee and Columbia Gulf.

establish by means of §§ 4 and 5. 613 F.2d at 1129–30. *See also Northern Natural Gas Co. v. FERC*, 780 F.2d 59 (D.C. Cir. 1985) (vacated in pertinent part pending reconsideration en banc). Putting aside the question (obviously not before us) of whether the Commission could use § 7 to remedy underrecoveries stemming from disappointing volume, it seems clear that the Commission is not obliged to do so.

Ironically, Tennessee invokes *Panhandle* and *Northern Natural* in attacking FERC's decision as unlawful ratemaking. Its argument appears to be that because a concern to prevent double recovery animated the Commission in those cases, it must not be allowed to rely on such a concern here. But neither of those cases laid down some general rule that concern for double recovery could never play a role in imposition of rate conditions under § 7. In those cases, the Commission sought to adjust rates previously found just and reasonable for service as to which no § 7 certificate was being sought; here, it is simply establishing rate conditions for the service to be certificated. We agree with FERC that Tennessee's argument stands *Panhandle* on its head.

In its most recent submission, Tennessee invokes two recent Commission decisions, *Panhandle Eastern Pipe Line Co.*, 39 F.E.R.C. (CCH) ¶ 61,101 (1987), and *Trunkline Gas Co.*, 39 F.E.R.C. (CCH) ¶ 61,100 (1987), apparently to support the proposition that rate conditions imposed in § 7 certificates may not derive in any way from data developed in prior settlements. In both cases the Commission was reviewing proposed rates for transportation service to be offered under Order No. 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R.), *partially reversed and remanded, Associated Gas Distributors v. FERC*, 824 F.2d 981 (D.C.Cir.1987). That Order dramatically revamped the rules under which pipelines might offer transportation under § 311 of the Natural Gas Policy Act, 15 U.S.C. § 3371 (1982), or "blanket certificate" transportation under § 7. In that wholesale revision of prior rules, the Commission expressly exercised its § 5 pow-

ers to determine, on a generic basis, that the pre-existing rate methodology for such transportation service was "unjust and unreasonable." *Associated Gas Distributors*, at 1008; 50 Fed.Reg. at 42,424–25, 42,427. It established a new methodology, requiring that pipelines set rates on the basis of "projected" transportation volumes. *See* 18 C.F.R. § 284.7(c)(3) (1986). In the decisions invoked by Tennessee, the Commission interpreted that requirement to refer to projections based on reasonably current data, and the data submitted by the pipelines did not qualify as such. As the Commission's exercise of its § 5 powers in Order No. 436 necessarily entailed a substantial break with prior rate methodologies, we see no connection between those cases and this one. They certainly establish no rule against seeking consistency between the methodology for setting § 7 rates and the rate methodology of a prior settlement.

Tennessee complains that rejection of incremental pricing here may prejudice its ability to establish the suitability of such pricing in its next general rate case, noting that the burden is on a party seeking to overturn an established methodology, *see ANR Pipeline Co. v. FERC*, 771 F.2d 507, 519 (D.C.Cir.1985). But adoption of the average-cost methodology occurred, at least implicitly, in the prior *settlement*. The Commission here made no ruling on the appropriateness of incremental pricing on the merits. To the extent that the prior settlement establishes momentum against incremental pricing for SP77, the additional impact of its continuation here should have no bearing on the merits of a later change.

■ Tennessee also claims an inconsistency in the Commission's treatment of Gulf as opposed to itself. As noted above, a contract between Tennessee and Gulf, approved by the Commission, allocates to Gulf 25 percent of the cost of SP77 in exchange for an entitlement to 25 percent of its capacity. The result is quite similar to Gulf Oil's simply being charged incremental rates under a firm service contract. We see no inconsistency: the 25 percent of the cost borne by Gulf obviously was not in

the rate base figure used in Tennessee's settlement, so the logic of the Commission's reasoning does not apply.

■ Finally, Tennessee faults the Commission for failure to adopt its suggestion, made in November 1986 in connection with this court's request to the parties for explanations, that it approve incremental pricing but credit any revenues in excess of what it would have received under system-wide pricing to its general system customers. Assuming that under *Panhandle* the Commission was free to adopt such a suggestion, we do not think it was obliged to give full consideration to a novel proposal emerging at this late stage of proceedings.

In sum, we find Tennessee's challenges to FERC's decision on its pricing scheme to be unavailing, and deny the petition for review with regard to this issue.

### III. AUTHORIZED FIRM SERVICE LEVELS

In the § 7 proceeding, the Commission authorized levels of firm service for two shippers, Natural Gas Pipeline Company of America ("Natural") and United Gas Pipe Line Company ("United"), sharply lower than the levels proposed by the two transporters. The Commission selected the lower levels on the basis of (1) information about Natural's and United's deliverable gas in the relevant offshore area and (2) contracts for onshore transportation presumably reflecting the shippers' estimates of likely usage. Tennessee and Columbia Gulf based their proposed levels on contracts entered into between them and the two shippers, entitling the shippers to ship such quantities and obligating them to pay fixed monthly charges based on these entitlements.[2]

At stake is the allocation of the risk of underuse. The transporting pipelines will be entitled to collect demand charges based on the authorized level, regardless of actual use. The Commission's decision increases the risk borne by the transporting pipelines (compared to what it would be if the

transporters' proposals were accepted); correspondingly, of course, it decreases the risk borne by the shippers.

In declining to authorize firm service for Natural and United at the levels requested by Tennessee and Columbia, FERC said,

> In a firm transportation service, it is reasonable to expect either that the proposed firm service will approximate the level of actual service to be performed or that a demonstration has been made that the capacity being reserved is needed by the shipper on a peak day. Otherwise, the shipper's customers would be required to bear the costs for service without receiving a corresponding benefit.

1985 Order, 30 F.E.R.C. (CCH) at 61,345. From this and the remainder of FERC's order, we understand it to rely on two propositions. First, firm service levels should necessarily approximate actual service. Second, the shippers' ratepayers should be protected from the risk of paying for unused pipeline services.

■ The first point ignores the interest in allowing firms to allocate risk among themselves. They may do this in a variety of ways. One way, of course, would be outright *co-ownership*; this was the risk-sharing arrangement adopted by Tennessee and Columbia Gulf as between themselves. Another would be advance payment of capital costs, coupled with explicit allocation of a fraction of pipeline capacity; this was the deal between Gulf Oil, on the one hand, and Tennessee and Columbia Gulf, on the other. A third is a long-term contract of the sort the transporters entered into with Natural and United. The Commission has offered no reason why radically disparate consequences should flow from the form of risk allocation adopted. The Commission may not "cavalierly disregard[ ] private contracts" in exercising its authority under the NGA. *See ANR Pipeline Co. v. FERC,* 771 F.2d at 519–20. The unreasoned rejection of the contracts here is nothing if not cavalier.

---

**2.** The parties do not dispute the purport of the agreements between the transporting pipelines and the two shippers.

The Commission's various disquisitions on this subject (the 1985 Order, the Order Denying Rehearing, the Order on Remand, and in its briefs) reflect a notion that the language of its original 1980 Order authorizing construction of SP77 somehow precludes freely negotiated allocation of the risk from the transporters to the pipeline shippers. We read the 1980 Order quite differently. In that order, as FERC persistently points out, it expressed concern that SP77 might be underused and that the transporters' ratepayers should be protected from such a risk. 12 F.E.R.C. (CCH) at 61,707. It accordingly took two steps to protect the transporters' ratepayers. First, in accordance with its own regulations, 18 C.F.R. § 2.65(a) (1980), it provided that unit costs for SP77 should be calculated in future rate proceedings on the basis of an average load factor of not less than 60 percent. This responded to an irony of cost-of-service ratemaking, that as demand falls the permissible ceiling price typically goes up, to permit recovery of cost. The 60 percent minimum load factor essentially meant that no matter what usage proved to be, unit charges would not be premised on usage below 60 percent of capacity. It had no bearing at all on the amount of firm service that would be certificated.

The second protective measure was to deny any inclusion of costs associated with the fraction of SP77 expected to provide service to other pipelines until the transporters received authority to provide such service. 12 F.E.R.C. (CCH) at 61,708. As we understand it, this would protect the transporters' customers with no connection to SP77 from its risks. It seems in no way to preclude efforts by the transporters to enter into risk-sharing arrangements with the shippers here.

■ We therefore turn to FERC's second explanation, which concerns the propriety of allowing the customers of the pipeline shippers to bear the cost of underutili-zation. It is inevitable that someone will pay such costs, of course.[3] Although we have sought illumination from FERC as to why shippers' ratepayers should be preferred to other potential loss bearers, the Commission has not, either in its Order on Remand or in its response to our prior requests, offered any real explanation. The conditions of the SP77 construction order aim at protection of the transporters' ratepayers (other than pipeline users of SP77). That in no way predetermines the allocation of the risk between the transporters' shareholders and the SP77 shippers' shareholders and ratepayers. In the absence of a clear explanation, imposition of costs on one group rather than another appears completely arbitrary.

FERC suggests in its Order on Remand, 38 F.E.R.C. (CCH) at 61,759, that certification of the firm delivery rates might make it more difficult for Natural's and United's ratepayers to question their prudence. This conclusory statement, insofar as it suggests that these ratepayers will otherwise be helpless, is undercut by the 1985 Order's requirement that Natural, United, and two other shippers demonstrate the prudence of these costs before including them in their Accounts No. 858 of the Uniform System of Accounts, 18 C.F.R. Pt. 201 (1986). Thus the Commission seems to have kept completely open its options as to loss-allocation between the shippers' ratepayers and their shareholders. Moreover, the cases cited by FERC for the idea that a § 7 certification precludes future challenges to the legitimacy of the rates authorized say nothing of the sort. To the contrary, both *Atlantic Refining Co. v. Public Service Comm'n,* 360 U.S. 378, 392, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312 (1959), and *Federal Power Comm'n v. Hunt,* 376 U.S. 515, 523–24, 84 S.Ct. 861, 866–67, 11 L.Ed.2d 878 (1964), indicate the provisional character even of rate conditions imposed under § 7. It follows *a fortiori* that a § 7

---

**3.** In its Order on Remand, 38 F.E.R.C. (CCH) at 61,758, FERC says that in spite of its concern with protecting the ratepayers of Natural and United, it "did not have as its primary aim the proper allocation of costs associated with underutilization of the SP77 facilities." This could be read as a rejection of the proposition just expressed. FERC might mean to suggest it can protect the shippers' ratepayers without concerning itself with the ultimate consequences. We reject such a reading, since it would plainly be arbitrary and capricious.

proceeding that does not even reach prudence issues cannot foreclose their later consideration.

Even if there were any such prospective influence, it would leave the decision arbitrary and capricious. In effect, the Commission is saying that it must impose the loss on A (the transporters' shareholders), because failure to do so would make it more difficult later to choose B (the shippers' shareholders) over C (their ratepayers). A more complete *non sequitur* seems hard to imagine.

We therefore remand the case for modification as appropriate in light of the principles we have enunciated. In view of the unusual circumstances of this case, in which FERC has had repeated opportunities to explain its reasons and repeatedly failed to do so satisfactorily, we think it appropriate to stress that FERC must, if at all tempted to persist in its original firm service limits, approach the matter anew, with due respect to the parties' contracts.

*It is so ordered.*