ALGONQUIN GAS TRANSMISSION COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent, Bay State Gas Company et al., Intervenor (two cases).

Nos. 75–1460, 76–1043.

United States Court of Appeals, District of Columbia Circuit.

Argued March 10, 1976.

Decided March 29, 1976.

John T. Ketcham, Washington, D.C., with whom Charles E. McGee, Robert J. Haggerty and Phil W. Jordan, Washington, D.C., were on the brief for petitioner.

John H. Burns, Jr., Atty., Federal Power Commission, Washington, D.C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D.C., were on the brief for respondent. Steven A. Taube, Attorney,

Federal Power Commission, Washington, D.C., also entered an appearance for respondent.

John S. Schmid, Washington, D.C., entered an appearance for intervenor Bay State Gas Co.

Before LEVENTHAL, ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This is a consolidated appeal from two temporary certificates[1] issued by the FPC to Algonquin, governing excess production of synthetic gas from a plant certified in Opinion No. 637, 48 FPC 1216 (1972).[2] The record, briefs and argument leave us uncertain as to the nature of the certificates, and identification of precise objections of petitioner and responses of the Commission. We have nevertheless become convinced that in the interest of justice[3] there may be some need for prompt consideration of relief to Algonquin. We therefore indicate what we consider the fundamental principles of law applicable to the issues raised in these appeals, and remand the record to the Commission for consideration in light of those principles.

*Factual Background.* In Opinion No. 637 (Dec. 1972) the Commission issued a § 7[4] certificate of public convenience and necessity to Algonquin authorizing it to sell up to 120,000 Mcf per day of synthetic natural gas, this to be mixed with natural gas, to its existing wholesale customers. Initially, Algonquin was authorized to provide annual service from October 16 through April 5[5] to its regular wholesale customers who at that time, had contracted for only 57,536 Mcf synthetic gas per day. The FPC opinion provided that service agreements to sell additional synthetic gas up to the 120,000 Mcf/d design approval could be submitted to the Commission under the same rate schedule governing the original wholesale customers (Rate Schedule SNG–1). That rate schedule was designed to assure that the cost of the synthetic natural gas service would be recovered only from those customers actually receiving that service. The Commission also adopted a "protective condition" whose interpretation and application have been the subject of continuing controversy in the instant and other proceedings. Condition 6(iv) (48 FPC at 1252) provides:

"notwithstanding the provisions of any rate schedule or applicable service agreement, said applicant shall not, without prior Commission approval, file any rate schedule providing for any increase in rates based in any part, directly or indirectly, upon any fixed unit costs calculated upon the basis of a total volume of production of synthetic gas by the aforesaid reforming plant, during any period from October 16 through April 15 in any year, less than the equivalent of 151 days production at the rate of 120,000 Mcf/d."

The Commission has interpreted that condition as requiring that any future rate increase be based upon the full design capacity of the synthetic natural gas plant (120,000 Mcf per day), and not upon the level of operation actually achieved. The rate schedule carries out that condition by a

1. The specific rulings to be reviewed were issued in *Algonquin Gas Transmission Company, et al.,* Docket Nos. CP 69–41, *et al.:* "Findings And Orders After Statutory Hearings Granting Applications And Applications to Amend, Consolidating Proceedings, And Permitting Interventions," issued on December 27, 1974; "Order Clarifying And Amending Certificates Of Public Convenience And Necessity," issued February 5, 1975; and "Order Denying Applications For Rehearing," issued on March 10, 1975, and a letter order issued November 13, 1975, granting Algonquin a temporary certificate of public convenience and necessity, and

an order denying rehearing issued January 9, 1976.

2. Also pending is the FPC's motion to defer judgment in these two certificate cases pending resolution of the pending § 7 proceedings, and Algonquin's motion to stay the Commission's Orders.

3. 28 U.S.C. § 2106 (1970).

4. 15 U.S.C. § 717f (1970).

5. A period now shortened to Nov. 1 through March 31.

demand component that is calculated by apportioning distribution of the plant's fixed costs on the assumption of full design capacity production. Algonquin has apparently not, however, been able to achieve full capacity production daily; the practical effect of condition 6(iv) as applied has thus been to require Algonquin to absorb substantial fixed costs.

The temporary certificates involved in this appeal were issued to permit sale of excess volumes of synthetic natural gas for the succeeding service periods of Nov. 1, 1974–April 15, 1975, and October 16, 1975 to April 15, 1976. In each case Algonquin contracted to sell gas to its new customers on the assumption it would produce gas at full design capacity, although it could not deliver in reality. In the first certificate, the Commission required that Algonquin curtail its new customers first whenever full production could not be achieved, and Algonquin appeals from that condition, requesting instead pro rata curtailment of all its customers. In the second certificate, the Commission retained the curtailment requirement of the first certificate, and also required that the demand charge of the rate schedule covering fixed costs be applicable to the new customers "only on those days when excess gas is tendered, and only to those volumes tendered." Algonquin challenges both those conditions here.

In addition to the instant proceedings, the issues raised in this case were also being considered in a § 4 rate[6] tariff proceeding. The Commission has required that the § 4 proceeding be bound, however, by condition 6(iv) of the original certificate, and that therefore Algonquin cannot file for a rate increase justified by failure to produce at full design capacity.[7] Also in progress before an administrative law judge is a proceeding re-evaluating the terms of the original § 7 certificate.

*Discussion.* In this case, the Commission has apparently departed from its existing, and approved, practice of using the § 7 certification requirement as a "holding operation on initial rates." *Consumer Federation of America v. FPC,* 169 U.S.App.D.C. 116, 125, 515 F.2d 347, 356 (1975). *Cert. denied* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975). Instead, the Commission seeks to hold Algonquin to a rate condition established before practical building and operating experience with a new technology could be accumulated and evaluated. The Supreme Court in *Atlantic Refining Co. v. Public Service Comm'n (CATCO),* 360 U.S. 378, 392, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312, 1321[8] (1959) recognized the appropriateness of putting rate conditions into § 7 certificates to protect consumer interests, but with the express purpose of furthering the Act's objectives as a whole by using those rate conditions "to hold the line awaiting adjudication of a just and reasonable rate."[9] By viewing the § 7 rate condition as rigid, binding on the § 4 proceeding, and modifiable only prospectively, the Commission has preempted the very § 4 proceeding that the Supreme Court in *CATCO* anticipated as providing the appropriate forum for final resolution of the public interest in just and reasonable rates.

**6.** 15 U.S.C. § 717c (1970).

**7.** "Order Granting Motion for Summary Disposition, Requiring Refunds and Submission of Revised Tariff Sheet," issued November 10, 1975. The Commission's actions in the rate tariff proceeding have been appealed to this court in Doc. No. 76–1116, but not consolidated with the present appeals.

**8.** *See also United Gas Improv. Co. v. Callery Properties,* 382 U.S. 223, 228, 86 S.Ct. 360, 363, 15 L.Ed.2d 284, 289 (1965).

**9.** An analogous situation to § 7 rate conditions was also considered in *FPC v. Hunt,* 376 U.S. 515, 525, 84 S.Ct. 861, 867, 11 L.Ed.2d 878, 885

(1964), validating regulations rejecting certificate filings as a matter of course if they were based on automatic escalation clauses. This ban could be characterized as a permanent fixing of a method of calculating rates, similar to what is at issue here, but there is a fundamental distinction between the two types of conditions in that the condition approved in *Hunt* does nothing to permanently fix the level of cost recovery, but simply rejects an automatic method of setting price increases based on economic or accounting factors that the FPC could reasonably find not automatically relevant to price increases.

In contradiction to Algonquin's assertions here,[10] we have no doubt that the Commission meant to establish a rate condition governing Algonquin's synthetic natural gas production in the original certificate. However, in applying that rate condition to automatically limit the terms of the temporary certificates at issue here, the Commission failed to give due consideration to either the precise terms of that condition or the inherent limits on rate conditions established in § 7 proceedings. Condition 6(iv) provides that no rate schedule calculating fixed unit costs on the basis of less than full design capacity production can be filed "without prior Commission approval." That provision must be read as including the implied condition that such Commission approval must not be unreasonably withheld. And condition 6(iv) in its entirety must be read in light of its threshold imposition in a § 7 proceeding, designed to protect consumer interests against inflated costs until the Commission has sufficient operating data before it to make a more sophisticated appraisal of the costs and benefits of doing business.

This is not to say that the Commission lacked the power to condition the temporary certificates as it did in this case. It might have determined that the costs of production or bugs in implementation were still too novel to be adequately evaluated, or that the existing rate structure would act as an effective incentive to improve production, or that protecting the rate structure generally requires refusing to escalate rates in such high cost incremental supply situations. But it cannot start with the assumptions that the original § 7 certificate provides a definitive solution, or that the only rate relief that can be granted by the Commission is one available, at some unknown time in the future, on wholly prospective terms.

Rate conditions set in the original § 7 certificate offer a temporary mechanism to protect the public interest until the regular rate setting provisions of the Act can come into play. The kind of relief available under the two sections differs radically; changes in § 7 certificates are prospective only and occur if ever in an indeterminate time frame; rate filings under § 4 can be suspended up to five months by the Commission but then go into effect subject to refund while the Commission decides whether to accept or reject the filing. Frequently, indeed typically, the Commission provides a mere one day suspension, with the overall public interest served by insisting on a refund obligation that ensures adjustment in accordance with the rates ultimately deemed just and reasonable. Such an approach may not protect consumer interests completely but does combine considerable protection, enhanced by the burden of proof that remains on the utility, with flexibility and equity. *Municipal Light Boards v. FPC,* 146 U.S.App.D.C. 294, 304, 450 F.2d 1341, 1351 (1971) *cert. den.* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). The suspension and refund provisions of § 4 protect regulated companies against deprivation of the substantial rights of covering the costs of doing business and earning a fair return on investment. By enacting § 4, Congress recognized those rights as substantial, and sheltered them from dissipation through regulatory lag or indecision. The Commission should not be able to defeat those rights indefinitely by engrafting permanent rate conditions to a § 7 certificate, or by holding those rights in abeyance while it reconsiders the original certificate conditions in a separate § 7 certificate proceeding. It must recognize the temporary character of rate conditions in temporary certificates, either by permitting contemporaneous rate adjustments in § 4, without preclusion by § 7 conditions,[11] or it

---

10. Algonquin has urged that condition 6(iv) instead simply requires Algonquin to contract to sell gas at full design capacity even if that production rate cannot be achieved.

11. Nor is it an answer to say that these rights can properly be worked out in a final certificate proceeding governing the permanent sale of excess gas. No retrospective relief for production under such temporary certificates is possible, and there is no automatic end to this ap-

must create the equivalent of § 4 flexibility in assessing rate and temporary certificate conditions in a § 7 proceeding.[12]

*Principles of Law.*

■ 1) It is not unreasonable for the Commission to require Algonquin to curtail its new customers exclusively rather than using a pro rata curtailment plan. Algonquin requested authority to sell "excess output", and it is a contradiction in terms to create excess gas by taking some of it away from the customers whose demand provides the baseline for its calculation. *See also Granite City Steel Co. v. FPC*, 115 U.S.App. D.C. 392, 394, 320 F.2d 711, 713 (1963): "The theory and purpose of the statutory restriction [§ 7a] appear to be that persons desiring gas for the first time, or desiring more gas, should not get it by taking it away from existing lawful customers."

■ 2) The provisions in the certificate appealed in No. 76–1043 permitting new customers to pay only the fixed costs demand charge proportionate to the gas they actually receive, and to calculate the fixed costs from a 120,000 Mcf/d baseline is not necessarily unreasonable. However,

a) The Commission may not impose those conditions simply because they are a consistent and automatic application of Condition 6(iv)'s original rate structure.

b) Under Condition 6(iv), which the Commission has held to govern temporary certificates as well as rate filings, prior Commission approval of a new rate filing or of a temporary certificate premised on new rates can not be withheld unreasonably.

■ c) In considering whether to extend approval of proposed conditions having rate implications in temporary certificates, the Commission must make a determination of the current public interest.

■ d) In the circumstances of this case, where the FPC has denied rate relief under § 4, but has certificated the sale of excess gas under conditions that in practical effect limit the ability of Algonquin to recover its fixed costs for the plant as a whole, consideration of rate revision to ameliorate that problem is in the public interest. Such consideration might most appropriately be undertaken in a § 4 proceeding applicable to the entire rate schedule, but if the Commission decides to proceed under a § 7 temporary certificate, it must determine that the conditions with rate impacts are in the public interest.

■ 3) If the Commission concludes that Condition 6(iv) should still govern Algonquin's temporary certificates, and prevents Algonquin from recovering its fixed costs on either an interim or permanent basis, it should provide specific findings supporting that conclusion.

f) If evidence supports it, the Commission might reasonably conclude that the public interest prohibits increasing rates at this time, because holding the line now will act as an effective incentive to increase Algonquin's real potential for productivity, or because the production and cost data still lacks the definitiveness necessary to conclude that Algonquin is not covering its fixed costs.

■ g) If the plant's technology is incapable of performing at full design capacity, the Commission has to consider whether an adjustment in rates is necessary. In making that determination, the Commission has to consider whether increased supply under the conditions of increased charges to the consumer serves, or is contrary to, the public interest. This determination should be made fairly in the light of the Commission's general policy governing high cost

---

proach of temporarily certificating excess gas in sight. Nor is it an answer to say, as the Commission does p. 9, brief in No. 76–1043, that Algonquin could simply decide not to accept a certificate it considered to be based on improper legal premises. Such principled action could come only at considerable financial sacrifice.

12. We are not to be taken as saying that rate conditions explicitly and reasonably set on a temporary basis in an original certificate proceeding can never pre-empt the normal rate suspension process under § 4. That question is not presented by this case.

incremental supply situations, taking into account both the benefits of flexibility in developing alternative sources of gas supply and the extent of impact of increased incremental costs on the maintenance of the overall natural gas rate structure.

*Conclusion.* In setting out the principles of law we deem relevant, we do not seek to exhaust all possibilities for resolving this dispute. As it is now before us, the arguments on both sides have partially foundered on mistaken assumptions. On remand, the Commission has full authority to reshape the issues before it in light of this opinion to allow amended filings or to consolidate this proceeding with the others now pending involving the same basic questions. Because of the confused status of this case, the failure of the Commission to exercise its discretion on rates in accordance with the Act's policy, and the perhaps consequent failure of Algonquin to set forth conditions in a temporary certificate setting that will provide it relief on some other basis than pro rata curtailment, we do not find it appropriate at this time to reverse or stay the Commission's decision. At this juncture, it would neither be appropriate, nor is a mechanism readily available, for us to fashion or mandate the relief desired by Algonquin. However, we do believe that substantial rights of Algonquin are at stake in this proceeding, and we therefore expect the Commission to address the question of the appropriateness of granting interim relief with some expedition. The record is remanded for further proceedings not inconsistent with this opinion.[13]

*So ordered.*

---

**13.** We are remanding the record, rather than the case to permit Algonquin to apply for further relief from the court in the event the Commission fails to grant relief in a reasonable time frame. The Commission, however, will have full freedom of action, to amend any of its orders in such manner as it finds in furtherance of the public interest.