**TRANSCONTINENTAL GAS PIPE LINE CORP., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 78–1426.

United States Court of Appeals, Fifth Circuit.

Feb. 6, 1979.

Andrews, Kurth, Campbell & Jones, Thomas F. Ryan, Jr., Robert G. Hardy, Washington, D. C., Andrews, Kurth, Campbell & Jones, Michael McLaughlin, Marcus L. Thompson, Houston, Tex., for petitioner.

Robert R. Nordhaus, Gen. Counsel, FERC, Howard E. Shapiro, Sol., Barbara J. Weller, McNeill Watkins, Washington, D. C., for respondent.

Before BROWN, Chief Judge, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

In this case Transcontinental Gas Pipe Line Corporation (Transco) petitions for review of a Federal Energy Regulatory Commission (the Commission)[1] order granting Transco a certificate of public convenience and necessity to construct and operate a major extension of its natural gas transmission network off the coast of Louisiana in the Gulf of Mexico. The certificate was subject to the condition that Transco comply with § 2.65(b) of the Commission's General Policy and Interpretations, 15 C.F.R. § 2.65(b), which attempts to insure pipeline utilization of at least 60% of capacity by denying the company recovery of pipeline costs if the 60% load factor required by that regulation is not achieved. The legality of the 60% condition is the major issue presented in this petition, but the Commission also argues that review is premature at this time because Transco has not been "aggrieved" within the meaning of the statute which governs judicial review, 15 U.S.C. § 717r(b).

### The Facts

On June 21, 1977, Transco applied for authorization to construct and operate a major extension of one of its natural gas pipelines in the Gulf of Mexico off the Louisiana coast. The estimated cost of the extension was $52,000,000, and the estimated maximum daily capacity of the extension was 240,475 million cubic feet of natural gas. Transco estimated that the load factor utilization for the second year of operation would be 65.45% of maximum capacity; for the 1978–79 winter season, 80.26%; and for the fifth year of operation, 38%.[2] Since there was no opposition to Transco's application, the Commission held an abbreviated hearing, as it was permitted to do in such cases, and issued the certificate that same day. The authorization, however, was "subject to compliance with . . . [15 C.F.R. § 2.65(b)]", which provides:

1. Pursuant to the provisions of the Department of Energy Organization Act, Pub.L.No.95–91, 91 Stat. 567 (1977) (to be codified in 42 U.S.C. § 7101 et seq.), and Exec.Order No. 12,009, 42 Fed.Reg. 46,267 (1977), the Federal Power Commission ceased to exist on September 30, 1977, and most of its functions and regulatory responsibilities were transferred to the Federal Energy Regulatory Commission, which, as an independent administrative agency within the Department of Energy, was activated on October 1, 1977. Section 705(e) of the Organization Act, to be codified as 42 U.S.C. § 7295(e), provides for the substitution of the new Commission as a party in cases such as this. For

the purposes of this opinion, the word "Commission", when used in the context of an action taken or statement made prior to October 1, 1977, refers to the Federal Power Commission; when used otherwise, the reference is to the Federal Energy Regulatory Commission.

2. Although there was some confusion at oral argument as to whether the estimate on the fifth year load factor was a part of the record, it appears that the estimate was included on an attachment to Transco's application. Therefore, we believe that this estimate is properly before us.

It is the intention of the Commission to enforce the [60%] requirement [of § 2.65(a)(4)] by permitting offshore pipeline facilities, certificated after the date of this order, to be included in Applicant's cost-of-service in future rate proceedings at an average unit cost predicated upon load factors of not less than 60 percent of the annual capacity available.

Both parties agree that the import of this condition in the certificate is a requirement that Transco operate the pipeline at 60% capacity or be unable to recover part of its costs.[3] Section 2.65(a)(4) of the Commission's General Policy and Interpretations requires an applicant to demonstrate

that its proposed facilities will be utilized, either by it individually or jointly with other pipeline companies, at a minimum annual load factor of 60 percent of the annual capacity available by the end of a 12-month period following the installation thereof, unless a waiver is issued.

■ Literally, this section allows a one-year start-up period and then seems to require 60% utilization in the next year only. Neither party has adopted such an interpretation of the regulation, however, and Transco concedes that the Commission has consistently interpreted the regulation to require 60% utilization in succeeding years. Although the Commission might well clarify the wording of this regulation, deference is due an administrative agency's interpretation of its own regulations, see, e. g., *Pillsbury Co. v. FTC*, 5 Cir. 1966, 354 F.2d 952, 963; and this reading of the regulation is not unreasonable.

The only other fact of apparent importance to the resolution of this case is the depreciation rate. Transco asserts in its brief, at 22, that its latest approved composite depreciation rate is 4.5%, a rate which would mean that, if straight-line depreciation were employed, the pipeline must remain in the rate base for 22 years for the

company to recover its investment. The Commission responds that Transco used a depreciation rate of 10% in its application. Brief for Respondent at 38. In its reply brief, at 16–17, Transco asserts that

The 10 percent rate, however, was used to develop a price for transporting gas for others through the new pipeline. Such rate is not used as a basis for recovering the investment in the authorized facilities, since the revenues generated from the transportation services for others are credited to Transco's overall cost-of-service in its rate proceedings.

A 10% depreciation rate implies full recovery, under straight-line depreciation, in 10 years. Because Transco asserts that utilization will drop below 10% by the fifth year of operation, any injury that it may suffer will not depend upon a depreciation rate of 4.5% or 10%.

### Reviewability

Analysis of the reviewability issue must begin with the language of the statute. 15 U.S.C. § 717r(b) provides that "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals . . . ." Transco is clearly a party to the proceeding, and it is not necessary under the statute that the order be "final". In our view, the reviewability question boils down to whether or not Transco has sustained an "injury in fact".

The Commission's position is that Transco has not been injured by the inclusion of this condition in the certificate and that it will not be injured, if at all, until the issuance of an order which sets just and reasonable rates. It notes that waivers are available, but there is no indication of the criteria used to evaluate waiver requests nor of the frequency with which they are granted.[4]

---

**3.** Read literally, § 2.65(b) does not require the applicant to do anything, and it might be argued that this "condition" is not really a condition at all. Neither party has adopted such an argument, however, and we decline to do so sua sponte.

**4.** There was also some confusion at oral argument as to when an applicant must apply for a waiver. Counsel for the Commission seemed to take the position that the waiver application must be submitted at the same time as the basic application if the applicant has reason to

Furthermore, if the condition had not been included in the certificate, the Commission would still be free to apply the policy at the § 4 or § 5 rate proceeding.

Transco's argument that it has been "aggrieved" proceeds along these lines: (1) its data predict a utilization of less than 60% within five years, (2) if the Commission accepts that data (and there is no indication to the contrary), then its refusal to issue a certificate without the 60% condition must mean that it does not intend to waive the condition later, (3) although there is always the possibility of a change in attitude or personnel at the Commission, this chance is somewhat remote and Transco must assume that it will not be granted a waiver, and (4) the increased risk of non-recovery of part of Transco's $52,000,000 investment because of the uncertainty in administrative action in the future is substantial and generates an immediate injury.

The case law does not provide an easy solution to this question of reviewability. The Commission quotes language from *Rochester Telephone Corp. v. United States*, 307 U.S. 125, 130, 59 S.Ct. 754, 757, 83 L.Ed. 1147 (1939), where Mr. Justice Frankfurter, in summarizing the "negative order" cases, stated that resort to the courts is premature where "the order sought to be reviewed does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action." *See also FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 619, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Columbia Broadcasting System v. United States*, 316 U.S. 407, 425, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

In this Circuit, the two leading cases on reviewability are *Magnolia Petroleum Co. v. FPC*, 5 Cir. 1956, 236 F.2d 785, 791, *cert. denied*, 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322 (1957) (denying reviewability); and *Atlanta Gas Light Co. v. FPC*, 5 Cir. 1973, 476 F.2d 142, 147 (finding reviewability). As stated in the latter case,

In general, the courts have declined to review non-final orders that are not "definitive" in their impact upon the rights of the parties and do not threaten the petitioner with "irreparable harm".

The requirement that the reviewable order be "definitive" in its impact upon the rights of the parties is something more than a requirement that the order be unambiguous in legal effect. It is a requirement that the order have some substantial effect on the parties which cannot be altered by subsequent administrative action.

476 F.2d at 147 (citations omitted). This test has since been followed in *Shell Oil Co. v. FPC*, 5 Cir. 1976, 531 F.2d 1324, 1326–27.

In response, Transco cites two cases to support its contention that the order is reviewable. In *Texaco, Inc. v. FPC*, 5 Cir. 1961, 290 F.2d 149, some gas producers had accepted temporary certificates with a vague refund condition and did not appeal until they received permanent certificates with the same condition attached. This Court held that they should have appealed the grant of the temporary certificate, saying

Clearly, the order granting the temporary certificates, when it embodied the conditions now complained of was an order which then aggrieved the petitioners. . . . This is not such a case as affected only eventualities that would affect petitioners' rights adversely on the contingency of future administrative action. Their right to a certificate without a condition in the terms proposed was then at issue and was then decided. The refusal of the Commission to grant the temporary certificate without the condition was an appealable order.

290 F.2d at 157. The force of this holding is greatly undercut by a case which Transco did not cite, *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968), where the Court held that "parties, at least other than the producer itself, may challenge a temporary certificate at the time a

believe that the pipeline utilization would fall below 60% in the near future. That position seems quite strained and unreasonable, and we

do not think that the regulation means that the Commission will not entertain waiver requests after the pipeline has been built.

permanent certificate is applied for." 391 U.S. at 44, 88 S.Ct. at 1544. In a footnote the Court cited the Fifth Circuit *Texaco* case and stated that it had no occasion to pass on the correctness of that decision. *Id.* at n. 32. These cases are distinguishable since they involved the temporary certificates issued without notice or hearing under 15 U.S.C. § 717f(c). The instant case involves a permanent certificate issued after notice and opportunity for comment.

The second case cited by Transco is *Texaco, Inc. v. FPC*, 3 Cir. 1969, 412 F.2d 740. This case involved a challenge to a general rule promulgated by the Commission in violation of the notice-and-comment requirements of the Administrative Procedure Act. In rejecting the argument that Texaco would not be harmed until a later proceeding, the Court stated,

> We believe that Texaco is harmed by being faced with such a general rule which it must overcome in any ad hoc waiver proceeding . . . . In filing a waiver application, an operator is entitled to be confronted only with rules adopted in the procedural manner prescribed by Congress.

412 F.2d at 746. This case is also distinguishable, but it does give some support to the proposition that an order is not unreviewable merely on the possibility of a waiver at some future administrative proceeding.

■ In the final analysis, arguments can be marshalled both for and against reviewability. Transco appears to be risking large sums of money on a relatively small field of gas, and the inability to recover its costs because of the condition in the certificate has an important bearing on that investment. The order is one which fixes the legal rights of Transco, and the order itself has injected an additional element of uncertainty into the calculus. The record seems fully developed, the issues are concrete, and we think that Transco is entitled to know whether the 60% condition is valid.[5]

5. In addition to the effect of the 60% condition on this pipeline extension, the Commission's regulation may be applied to other pipeline

### The 60% Condition

Although § 2.65(b) has been a part of the Commission's General Policy and Interpretations since 1968, it seems that the Commission has not always included it as a condition in the certificates of public convenience and necessity as a matter of course. Transco asserts in its brief, at 20, that since 1968 it has been granted approximately 20 offshore construction certificates and that it was not until 1977 that such a condition was imposed in a certificate. This seems understandable, since the policy requires an applicant to demonstrate that the 60% capacity figure will be met, and it states that the Commission intends to enforce it by denying recovery of costs if the 60% figure is not met. Thus, there seems to be no particular reason to require language in the certificate which merely duplicates the policy statement.

■ 15 U.S.C. § 717f(e) provides that "the Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." The issue in this case is not whether § 2.65(b) should have been promulgated as a regulation pursuant to the APA requirements, but whether this condition attached to this certificate is "reasonable" and required by the "public convenience and necessity". Any attack on a condition in a certificate issued by the Commission must confront the well-established principle that generally the Commission has extremely broad authority to condition certificates of public convenience and necessity. *See Atlantic Refining Co. (CATCO) v. Public Service Commission of New York*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

■ Transco mounts a three-pronged attack on the condition, arguing that it is (1) inconsistent with a determination that the public convenience and necessity require the

extensions proposed by Transco, or by other companies, in the future.

construction of this pipeline, (2) inherently unreasonable, and (3) unsupported by reasoning or evidence.

Transco's first argument seems to reduce to the proposition that the Commission has an affirmative obligation to evaluate the geological data, determine the recoverable reserves, and pick the appropriate pipeline size at the outset before it issues the certificate. Transco asserts that the Commission is attempting to reserve the right to determine later that Transco should have constructed smaller sized facilities. Of course, the public also has an interest in promoting the optimal use of facilities which have been constructed at the most efficient scale. The public interest would be ill-served by the proliferation of offshore pipelines not built to the most efficient scale or by the use of either inadequate or oversized pipelines. It is part of the Commission's responsibility to consider such factors, and it is not inconsistent to require that a pipeline be utilized at 60% of its capacity and to determine that the pipeline is required by the public convenience and necessity.

Transco's "inherently unreasonable" argument repeats much of its "second-guess" argument, adding that the 60% requirement is unduly onerous and punitive. This conclusion is based upon the fact that gas supplies are not known; they can only be estimated. This much is certainly true, but all business decisions are based upon estimates of the future. If Transco's best estimates indicate a small field, then it certainly could have declined the certificate and applied for a pipeline with a lower capacity. Indeed, it argues that the 60% condition actually works to force companies to hedge their bets by underestimating the supply of natural gas and undersizing the proposed facilities in order to recover their investments. It appears to us that the practical effect of the regulation is to place a little more pressure on companies to refine their estimates so that they will construct facilities of an optimal size. Certainly, no prudent investor would deliberately undersize his pipeline if his best information indicated a substantial possibility of a large field with the attendant profits.

Transco finally argues that the Commission must adduce some "evidence and reasoning" to support its general policy statement. To whatever degree Transco's argument may be correct, we believe that the Commission has more than discharged any obligation to supply some "evidence and reasoning". In the order denying rehearing, the Commission stated:

> The 60 percent load factor was an exercise of Commission judgment based upon the normal pipeline design capacity required to permit the maximum take provisions permissible under most Southern Louisiana gas purchase contracts. Under these contracts a pipeline is authorized to take up to 125 percent of the daily contract quantity obligation (DCQ). If a field were depleted at a rate necessary to meet the DCQ obligation, the pipeline facilities would have a load factor of 80 percent (i. e. $100 \div 125 = 80\%$). However, to allow for flexibility in the design of facilities, this optimum level of operation was discounted to a 60% level which, it should be noted, is the annual load factor attained if the pipeline buyer takes gas at a rate equal to only 75% of the DCQ (i. e., $75\% \div 125\% = 60\%$).

This condition is clearly not arbitrary or capricious, and the Commission has articulated a principled rationale for choosing the figure of 60%.[6]

Finally, Transco argues that many of the newer Louisiana fields are being substantially depleted in 5 to 7 years and that few firms which try to recover such gas will be able to recover their investments if the 60% rule is upheld and applied. We could not discover any support for this statement in the record, but common experience suggests that it may be substantially accurate. The country has experienced unprecedented shortages of natural gas in recent winters,

**6.** It is of some significance that neither party has cited any case dealing with this regulation and that a computer search failed to uncover any such cases. Somehow the industry has been able to live with this regulation for the last ten years.

and those shortages may have been at least partly caused by public policies which have kept the price of natural gas at a low level and discouraged exploration and drilling for marginal or doubtful fields. Congress has clearly been advised of the arguments and evidence, pro and con, and our system of government entrusts such matters in the first instance to that body. Congress has in turn placed substantial responsibilities in the hands of the Commission, and presumably that body is also aware of any declining production in the Louisiana fields. It is not totally irrational, arbitrary, or capricious for the Commission to attempt to deal with these important, complex issues in the manner which it has employed in this case. We may not substitute our judgment for that of the Commission. *Cf. Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

AFFIRMED.