TENNESSEE GAS PIPELINE COMPA-
NY, A DIVISION OF TENNECO INC.
and Columbia Gulf Transmission Com-
pany, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 81–1711.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 2, 1982.
Decided Sept. 10, 1982.

Melvin Richter, with whom Harold L.
Talisman, Barbara J. Klein and Terence J.
Collins, Washington, D. C., were on brief,
for petitioners.

Eli Farrah, with whom Charles A. Moore, Gen. Counsel and Barbara J. Weller, Asst. Sol., F. E. R. C., Washington, D. C., were on brief, for respondent.

Before ROBINSON, Chief Judge, ROBB, Senior Circuit Judge, and LARSON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge LARSON.

LARSON, Senior District Judge:

This case arises under section 19(b) of the Natural Gas Act[1] and involves a petition filed jointly by Tennessee Gas Pipeline Company (Tennessee) and Columbia Gulf Transmission Company (Columbia Gulf) to reverse and set aside two orders[2] issued by the Federal Energy Regulatory Commission (Commission). Petitioner Tennessee owns and operates a natural gas pipeline system extending from its sources of supply in Texas, Louisiana, and the Gulf of Mexico to New England. Petitioner Columbia Gulf owns and operates a pipeline system extending from offshore Louisiana to northeastern Kentucky, and transports gas purchased by Columbia Gas Transmission Corporation outside the Appalachian region.

On August 18, 1979, Tennessee and Columbia Gulf filed a joint application for a certificate of public convenience and necessity pursuant to section 7(c) of the Natural

Gas Act[3] for authority to construct and operate an off-shore pipeline and gathering system known as the SP77 System. This system extends from an existing platform in the South Pass Area, offshore Louisiana, to a point onshore in Plaquemines Parish, Louisiana, and has a total capacity of 553,-600 Mcf. The facilities are intended to be used to transport gas for Tennessee and Columbia Gulf, as well as for Gulf Oil Corporation,[4] and four other natural gas pipeline companies that own reserves in the area.[5]

Prior to the petitioners' joint application, the Commission[6] had issued a general policy statement concerning applications for certificates of public convenience and necessity in the offshore southern Louisiana area. To assist the Commission in evaluating these applications, the statement provided that an applicant:

"(1) Detail . . . the efforts it has made to utilize existing and proposed offshore facilities owned by other jurisdictional companies to transport Applicant's gas;

(2) Demonstrate that it has consulted with other jurisdictional entities with respect to the possibility of utilizing the proposed facilities to transport gas to onshore installations for such entities;

(3) Utilize 30-inch (or larger if technologically possible) pipe for its offshore main line facilities . . . ;

---

* Of the United States District Court for the District of Minnesota, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. 15 U.S.C. § 717r(b) (1976 & Supp. IV 1980).

2. The specific orders to be reviewed are: "Findings and Order After Statutory Hearing Issuing Certificate of Public Convenience and Necessity and Granting Petitions to Intervene," issued on September 26, 1980, and "Order Granting and Denying Rehearing, and Amending Order Issuing Certificate of Public Convenience and Necessity," issued on April 29, 1981, in FERC Docket No. CP79–444.

3. 15 U.S.C. § 717f(c) (1976 & Supp. IV 1980).

4. The applicants also requested approval of the acquisition of certain offshore platform facilities and authorization to transport gas for Gulf Oil Corporation. In exchange for providing 25 percent of the cost of the facilities, Gulf Oil

Corporation is entitled to use 25 percent of the total daily capacity, or 138,400 Mcf per day.

5. United Gas Pipeline Company, Natural Gas Pipeline Company of America, Southern Natural Gas Company, and Transcontinental Gas Pipe Line Corporation own reserves in the area, and arrangements to attach these fields to the main line were contemplated.

6. On October 1, 1977, the Federal Power Commission was terminated and its functions transferred to the Federal Energy Regulatory Commission. This opinion will therefore use the term "Commission" to refer to the Federal Power Commission in the context of actions taken prior to October 1, 1977. *See* 15 U.S.C. § 717 (Supp. IV 1980); *Transcontinental Gas Pipe Line Corp. v. FERC,* 589 F.2d 186, 187 n.1 (5th Cir. 1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980).

(4) Demonstrate that its proposed facilities will be utilized, either by it individually or jointly with other pipeline companies, at a minimum annual load factor of 60 percent of the annual capacity available by the end of a 12-month period following the installation thereof, unless a waiver is issued." 18 C.F.R. § 2.65(a).

Section 2.65(b) continued:

"It is the intention of the Commission to enforce the fourth requirement by permitting offshore pipeline facilities . . . to be included in Applicant's cost-of-service in future rate proceedings at an average unit cost predicated upon load factors of not less than 60 percent of the annual capacity available."

Based upon estimates of the total gas reserves available for transportation through the SP77 System,[7] the Commission issued an order on September 26, 1980, finding that:

"[T]he applicants have not demonstrated that the 'proposed facilities will be utilized, either by it individually or jointly with other pipeline companies, at a minimum annual load factor of 60 percent of the annual capacity available by the end of a 12-month period following the installation thereof' as required by Section 2.65(a) of the Commission's General Policy and Interpretations. Despite this deficiency in reserves, gas exploration activities in proximate fields appear promising, and the project will be certificated. However, to encourage the prompt development and attachment of proximate reserves and to protect jurisdictional ratepayers from the burden of costly, substantially underutilized facilities, the facilities authorized herein will be included in the cost-of-service of Tennessee and Columbia Gulf in future rate proceedings at an average unit cost predicated upon a load factor of not less than 60 percent of the annual capacity available, as provided in Section 2.65(b)."

On October 27, 1980, Tennessee and Columbia Gulf filed a joint application for rehearing of the above order, requesting that the 60 percent load factor condition be deleted in its entirety or modified to require only an initial demonstration of 60 percent utilization, rather than imposing the 60 percent condition on a permanent basis. By order issued April 29, 1981, the Commission denied rehearing on this issue, and modified its September 26, 1980 order to make clear that the 60 percent load factor condition was intended "[t]o encourage prompt development and attachment of reserves proximate to Applicants' SP77 pipeline system, and to protect jurisdictional ratepayers from the burden "of costly, substantially underutilized facilities."

■■■ Tennessee and Columbia Gulf have appealed to this court, claiming that the Commission's imposition of the 60 percent load factor is unreasonable and improper because it exceeds the Commission's power under section 7(e) of the Natural Gas Act.[8] Because we believe that the Commission acted in a reasonable manner and within its authority, we affirm the two orders challenged by the petitioners.

Section 7(e) of the Natural Gas Act grants the Commission broad power "to attach to the issuance of [a] certificate and to the exercise of the rights granted thereunder such reasonable terms as the public convenience and necessity may require." *See Transcontinental Gas Pipe Line Corp. v. FERC*, 589 F.2d 186, 190 (5th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980) (hereinafter Transco) (citing *Atlantic Refining Co. (CATCO) v. Public Service Commission of New York*, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959)). The Commission's certificate and conditioning authority is the means by which it effectuates the purpose of the Natural Gas Act "to underwrite just and reasonable rates to the consumers of natural

7. The Commission's September 26, 1980 order stated that Tennessee and Columbia Gulf had estimated that there were dry gas reserves of 965,398,000 Mcf available for transportation through the system.

8. 15 U.S.C. § 717f(e) (1976 & Supp. IV 1980).

gas." *Atlantic Refining Co. (CATCO) v. Public Service Commission of New York*, 360 U.S. at 388, 79 S.Ct. at 1253. Thus, the Commission is authorized to "scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services and the characteristics of the rate structure . . . at a time when such vital matters can readily be modified as the public interest may demand." *FPC v. Hunt*, 376 U.S. 515, 525, 84 S.Ct. 861, 867, 11 L.Ed.2d 878 (1964) (citing House Comm. on Interstate Commerce, H.R.Rep.No. 1290, 77th Cong., 1st Sess., 2–3). *See also California v. Southland Royalty Co.*, 436 U.S. 519, 524, 98 S.Ct. 1955, 1958, 56 L.Ed.2d 505 (1978); *Public Service Commission of New York v. FPC*, 543 F.2d 757, 779, 794 (D.C. Cir.1974), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976).

Tennessee and Columbia Gulf nonetheless allege that the 60 percent load factor is a permanent rate condition, and, citing this court's opinion in *Algonquin Gas Transmission Co. v. FPC*, 534 F.2d 952 (D.C.Cir.1976), argue that the Commission's conditioning authority does not extend to such permanent conditions. Petitioners misconstrue our holding in the *Algonquin* case. In *Algonquin*, the Commission had issued a certificate permitting sales of excess volumes of synthetic natural gas to Algonquin's existing wholesale customers, subject to the condition that all future section 4[9] rate increases be based on the full capacity of the natural gas plant, regardless of the capacity actually achieved. *Id.* at 954. In a separate proceeding, the Commission also held that Algonquin was bound by this same condition in a section 4 rate increase proceeding. Because Algonquin could not file for a rate increase that was justified by its failure to produce at full capacity, its section 4 rights to change the condition were completely preempted.[10] We noted that "[t]he Commission should not be able to defeat [section 4] rights indefinitely by

engrafting permanent rate conditions" through a section 7 temporary certificate. *Id.* at 956. Contrary to petitioners' claims, we did not find that the Commission lacked the authority to condition the temporary certificates under review as it did. Rather, we held that the Commission could not automatically impose the condition at issue and could not unreasonably preclude its reconsideration through a rate revision in a section 4 proceeding. *Id.* at 956–57.

The 60 percent load factor condition in the present case does not preclude Tennessee and Columbia Gulf from filing proposed rates under section 4 that treat the costs of their facilities differently than the Commission has stated it intends to treat them. The companies' use of the section 4 suspension and refund provisions is not preempted as in *Algonquin*, and because the proposed rates will go into effect while the Commission decides whether to accept or reject the filing, the petitioners' rights will be sheltered "from dissipation through regulatory lag or indecision," as Congress intended. *See id.* at 956. For these reasons, we conclude that the Commission may lawfully attach the 60 percent load factor condition to a certificate of public convenience and necessity as it has in this case.

Petitioners also urge that the imposition of the 60 percent requirement in this case is unreasonable because the condition would operate to deny Tennessee and Columbia Gulf full recovery of their cost of service should utilization of the SP77 System fall below 60 percent. If the estimates submitted to the Commission are correct, utilization of the facilities may fall below this level as early as 1986, and unless the condition is waived or the rates modified, petitioners will be forced to bear that portion of the cost attributable to the difference between the utilization level and 60 percent. Tennessee and Columbia Gulf allege that this result is inconsistent with the Commis-

---

9. 15 U.S.C. § 717c (1976 & Supp. IV 1980).

10. As we noted in *Algonquin*, rates filed pursuant to section 4 can be suspended for no more than five months before they go into effect

subject to refund. Relief under section 7 is prospective only. *See* 15 U.S.C. §§ 717c, 717f(e) (1976 & Supp. IV 1980); 534 F.2d at 956.

sion's finding that the proposed system is required by the public convenience and necessity. They point out that the size of the system was justified because of the need to render transportation services to other pipeline systems with reserves in the area and because of the high take-or-pay obligations required by producers as a condition to committing their offshore gas reserves. Petitioners suggest that the Commission's orders ignored these important facts, as did the *Transco* court when it determined under similar circumstances that the 60 percent condition was reasonable. *See Transco, supra,* 589 F.2d at 191.

Upon review of petitioners' claims, we are persuaded by the Fifth Circuit's reasoning in *Transco,* and believe that the Commission's actions were reasonable in this case. The Commission found that the applicants' reserve estimates would not satisfy the 60 percent minimum use requirements of section 2.65(a), but granted the requested certificate based upon promising exploration activities in adjacent fields. In protecting the public interest, the Commission imposed the risk on the pipeline companies that the facilities were too large. We cannot say that it was an arbitrary and capricious act to require 60 percent utilization "to encourage the prompt development and attachment of proximate reserves and to protect jurisdictional ratepayers from the burden of costly, substantially underutilized facilities."

The record demonstrates that the Commission considered the reserves of other pipelines and the need to transport this gas in the SP77 System. Petitioners' take-or-pay obligations will certainly affect the flow of gas through the pipeline, and the Commission has acknowledged that the competition for supplies faced by interstate pipelines "has resulted in interstate pipelines accepting and undertaking extensive take-or-pay obligations in connection with domestic gas supplies." *See, e.g., East Tennessee Natural Gas Co.,* 16 FERC ¶ 61,127 at 61,299 (1981). Additional reserves may be found near the SP77 System, but it appears that substantial declines in reserves

in the offshore area may be expected in the near future. Nonetheless, the Commission takes account of declining reserves through a depreciation rate, and although petitioners argue that the condition will prevent them from recovering all costs despite the depreciation rate, the Commission is not obliged to grant a certificate that permits pipelines to agree to take-or-pay obligations that require the construction of oversized facilities. Petitioners' final contention that the 60 percent condition is unreasonable because it penalizes them even if their estimates are correct also must fail. Petitioners could have declined the certificate and applied for a pipeline with less capacity, and can in the future seek to waive the condition by establishing that it is no longer necessary.

In response to the problem of establishing the optimal size for the proposed facilities in this case, the Commission balanced consumer and investor interests by allowing construction of the facilities as proposed, but putting investors on notice that they may be required to share in the costs of a portion of the facilities to the extent they are not "used and useful." *See generally NEPCO Municipal Rate Committee v. FERC,* 668 F.2d 1327, 1333–34 (D.C.Cir. 1981); *Tennessee Gas Pipeline Co. v. FERC,* 606 F.2d 1094, 1123–24 (D.C.Cir.1979), *cert. denied,* 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605, 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1113 (1980). We find this to be a reasonable solution to a difficult problem, and accordingly we defer to the judgment of the Commission that the proposed facilities are in the public interest if the 60 percent load factor condition is attached. *See Transco, supra,* 589 F.2d at 191–92.

The Commission's orders are

*Affirmed.*