761 F.2d 780
 245 U.S.App.D.C. 377, 66 P.U.R.4th 542
 MARYLAND PEOPLE'S COUNSEL, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Associated Gas Distributors, Process Gas Consumers Group and
American Iron and Steel Institute, Intervenors.
 No. 84-1090.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 22, 1985.
Decided May 10, 1985.
 
 Carmen D. Legato, Washington, D.C., with whom Thomas M. Lemberg, Washington, D.C., John K. Keane, Jr. and Thomas C. Gorak, Baltimore, Md., were on brief, for petitioner.
 Andrea Wolfman, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Solicitor, F.E.R.C., Washington, D.C., was on brief, for respondent. Jerome M. Feit and A. Karen Hill, Attys., F.E.R.C., Washington, D.C., entered appearances for respondent.
 William H. Penniman, Washington, D.C., with whom Edward J. Grenier, Jr., Washington, D.C., was on brief, for intervenors Process Gas Consumers Group, et al. Richard A. Oliver, Washington, D.C., entered an appearance for intervenors Process Gas Consumers Group, et al.
 Frederick Moring and Herbert J. Martin, Washington, D.C., were on brief, for intervenor Associated Gas Distributors.
 Before MIKVA, GINSBURG and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 This case is a companion to Maryland People's Counsel v. FERC, 761 F.2d 768 (D.C.Cir.1985) (MPC I );[1] it features Federal Energy Regulatory Commission (Commission or FERC) "blanket" permission for interstate transportation of natural gas sold directly by producers to end users. The Commission action challenged here is part of the agency's response to the unanticipated swing from the natural gas shortages of the 1970's to the "deliverability surplus" of the 1980's. Notably, the surplus has not been attended by lower prices to most natural gas consumers.[2] Instead, between the inception of the surplus in 1981 and the second quarter of 1984, rates paid by residential gas users rose by almost 23% in real-dollar terms. See ASSISTANT SECRETARY FOR POLICY, SAFETY, & ENV'T, U.S. DEP'T OF ENERGY, INCREASING COMPETITION IN THE NATURAL GAS MARKET: THE SECOND REPORT REQUIRED BY SECTION 123 OF THE NATURAL GAS POLICY ACT OF 1978, at 8 table 1-3, 17 (DOE/PE-0069 Jan. 1985) [hereinafter cited as DOE REPORT].[3]
 
 
 2
 In the orders at issue,[4] FERC expanded interstate pipelines' authority for the carriage of direct-sale gas[5] to encompass transportation to "any end user, including those who use gas as a boiler fuel." 48 Fed.Reg. 34,872 (1983).[6] The controversy before us is sparked by the thrust of FERC's action: the orders permit pipelines to transport gas at lowered prices to "noncaptive consumers"--large industrial end users capable of switching to alternative fuels--without any obligation to provide the same service to "captive consumers," a group that includes local distribution companies (LDCs) and their residential customers.
 
 
 3
 The Commission, we conclude, has not adequately attended to the agency's prime constituency--the consumers whom the Natural Gas Act (NGA) was designed "to protect ... against exploitation at the hands of natural gas companies." FPC v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944). Principally, the Commission has slighted its charge by failing to evaluate the anticompetitive consequences of its action. We therefore vacate the "blanket certificate" orders insofar as they permit transportation to fuel-switchable end users without requiring pipelines to provide the same service to LDCs and captive consumers on nondiscriminatory terms, and we remand the matter to the Commission for renewed consideration.
 
 I.
 
 4
 Acute gas shortages during the 1970's prompted Congress to enact the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. Secs. 3301-3432 (1982). To stimulate the interstate flow of gas, the NGPA substantially terminated Commission wellhead price regulation.[7] Mindful of the lean years, interstate pipelines promptly tied themselves to long-term contracts with producers at decontrolled prices; many of these contracts provided for automatic price escalations. But the market forecasts leading pipelines to high-price contracts that ran for years proved incorrect. Mild winters, conservation habits acquired in curtailment days, and the lower prices of competing fuels contributed to a decline in demand. FERC became particularly concerned about the ability of large industrial fuel users to shift to alternative fuels cheaper than the gas purchased by pipelines under long-term contracts: fuel-switchable customers' departure from the system, the Commission feared, would saddle pipelines' "captive" customers with larger shares of the pipelines' fixed costs and dull producers' appetite for future exploration and development. See 48 Fed.Reg. at 34,872.
 
 
 5
 Traditionally, gas has flowed "from producer to pipeline to distributor to consumer, with title passing at each change of possession." Pierce, supra note 2, at 348. But FERC surveyed a situation in which producers had excess gas on their hands while pipelines locked into disadvantageous contracts with producers were "seemingly ... unable to respond to price competition from alternative fuels." 48 Fed.Reg. at 34,872. The Commission saw promise in arrangements whereby pipelines would simply transport gas sold directly by producers, at prices competitive with alternative fuels, to end users who might otherwise exit the system. Cf. MPC I (gas released from contract between producer and pipeline with corresponding reduction of pipeline's "take-or-pay" liability). FERC therefore decided to facilitate such arrangements.
 
 
 6
 Section 7(c)(2) of the NGA, see supra note 5, authorizes FERC to permit interstate transportation of direct-sale gas "used by any person for one or more high-priority uses, as defined, by rule, by the Commission." 15 U.S.C. Sec. 717f(c)(2) (1982).[8] The Commission had previously implemented this authority in regulations governing certificates for transportation of direct-sale gas to certain high-priority users, including hospitals, schools, and parties proposing to put the gas to an "essential agricultural use." See Certification of Pipeline Transportation for Certain High Priority Uses, 44 Fed.Reg. 24,825, 24,828 (1979) (Order No. 27) (codified at 18 C.F.R. Secs. 157.100-.105 (1984)). FERC had also issued a kindred order (based on section 311(a) of the NGPA, 15 U.S.C. Sec. 3371(a) (1982)) approving a temporary transportation program to wean certain fuel-switchable end users off then scarce fuel oil. See Transportation Certificates for Natural Gas for the Displacement of Fuel Oil, 44 Fed.Reg. 30,323 (1979) (Order No. 30) (expired 1981). In the action challenged here, the Commission invoked section 7(c)(2) to broaden pipelines' transportation authority in two significant respects.
 
 
 7
 First, Order No. 319 streamlines section 7 certification procedures by establishing criteria for the issuance of "blanket certificates" for the transportation of direct-sale gas.[9] Any transportation program meeting the order's criteria is "generically" authorized to proceed on a "self-implementing" basis. This means that a full-dress section 7 inquiry into the "public convenience and necessity" is required neither for the entire program nor for the separate transactions the program comprises. Blanket certificates for transportation to "high-priority" end users (a category that Order No. 319 expands, see 48 Fed.Reg. at 34,877) are good for ten years if the gas is "owned and developed" by the end user, for five years if not. Authorization for longer periods may be obtained pursuant to simplified "notice and protest" procedures. See 18 C.F.R. Sec. 157.205 (1984) (automatic authorization if no protests are filed within forty-five days of publication in the Federal Register ). Among further streamlining prescriptions, Order No. 319 provides that two-year blanket certificates for transportation to LDCs--made possible by preexisting regulations, see id. Sec. 284.102--may be supplemented by authorization for longer periods if notice-and-protest procedures are followed. See id. Sec. 157.209(a)-(b); 48 Fed.Reg. at 34,876, 34,879.
 
 
 8
 Order No. 319 is not attacked in this case--indeed it is applauded--to the extent that it merely shrinks regulatory obstacles to transportation of lower priced gas to LDCs and high-priority end users. In conjunction with Order No. 234-B, however, the procedural simplifications take on a different cast. Order No. 234-B, issued the same day as Order No. 319, swells the ranks of end users eligible for direct-sale gas by permitting "transportation under the blanket certificate for any end user, including those who use gas as a boiler fuel." 48 Fed.Reg. at 34,872. Blanket certificates allow such transportation to proceed on a self-implementing basis for 120 days; as in the case of transportation to high-priority end users, longer-running authorization may be sought in notice-and-protest proceedings. Id. at 34,874. The order states that low-priority end users are to be included in the blanket certificate program "during a two-year experimental period extending through June 30, 1985," id. at 34,873; several weeks ago, FERC proposed an enlargement of this trial period until December 31, 1985, see supra note 6.
 
 
 9
 The Commission initially offered this declaration of its hope that Order No. 234-B might be good for what ails the gas market:
 
 
 10
 [A]uthorization of interstate pipeline transportation would be greatly expedited, and the Commission hopes that this flexibility will more easily permit gas to reach markets at prices reflective of the supply and demand characteristics of those markets. In addition, it may mitigate the pressures being felt by interstate pipelines ... and shield customers without alternative fuel capability from increased pipeline fixed costs. The Commission believes that this designation will encourage willing buyers and sellers of natural gas to enter into purchase contracts directly. At the same time, this rule should provide some stimulus to the exploration and development of long-term domestic gas reserves.
 
 
 11
 48 Fed.Reg. at 34,873. In Order No. 319, FERC tendered a further rationale: "By providing end users with an alternative to purchasing all of their gas requirements from the system supply of a distributor or interstate pipeline, these programs encourage pipelines to adopt gas purchasing practices which keep their delivered prices competitive." 48 Fed.Reg. at 34,877.
 
 
 12
 A month after the issuance of Order Nos. 319 and 234-B, petitioner Maryland People's Counsel (MPC) requested a rehearing.[10] Application for Rehearing of the Maryland People's Counsel (Aug. 19, 1983), reprinted in Joint Appendix at 202. MPC vigorously contended then, as it does now, that the Commission has neglected or misperceived the situation of "captive" consumers--the gas users that Congress centrally intended to protect through the agency's NGA superintendence. MPC charges that the blanket certificate orders work together to remove the last rampart against monopoly pricing by interstate pipelines.
 
 
 13
 MPC's argument runs this way. "[T]he economic power of the interstate pipelines is essentially a given." Tenneco Oil Co., 26 F.E.R.C. p 61,030, at 61,069 (Jan. 16, 1984). Indeed, the monopoly power of pipelines was the chief impetus behind passage of the NGA. The NGPA, on the other hand, reflects a congressional belief that gas production is reasonably competitive, and that therefore market forces, rather than FERC, should set wellhead prices. Citing its loss of power over prices charged by producers, FERC held in Tennessee Gas Pipeline Co., 21 F.E.R.C. p 61,004 (Oct. 1, 1982), that it was obliged to permit pipelines to pass through to their customers even imprudently incurred gas acquisition costs; only in circumstances involving misrepresentation of price paid or abuse rising to the level of "reckless disregard" could the Commission provide correction. See, e.g., Columbia Gas Transmission Corp., 26 F.E.R.C. p 61,034 (Jan. 16, 1984), petition for review filed sub nom. Associated Gas Distributors v. FERC, No. 84-1100 (D.C.Cir. Mar. 16, 1984).
 
 
 14
 The Commission's soft standard for reviewing pipelines' gas acquisition costs--costs that, as we stressed in MPC I, 761 F.2d at 776, account for about 85 percent of wholesale rates--combines with other disincentives to cut these costs. Major gas pipelines, in recent years, have become more "backward vertically integrated"--they own significant gas exploration, development, and production affiliates. See, e.g., Pierce, supra note 2, at 367. Absent competitive spurs or close regulatory scrutiny of gas acquisition costs, self-dealing between pipelines and affiliated producers "is likely to occur"; pipelines "can hide monopoly profits through excessive payments to their own producing arms." Id. at 366. Moreover, even when pipelines do not obtain gas from their own production facilities, they may lack the spark it takes to engage in the unpleasant business of renegotiating long-term contracts with producers; only competition or stringent regulation can be expected to prod them to do so. Ever since Tennessee Gas Pipeline, however, effective regulation of gas acquisition costs has been out of the question; thus, if consumers are to be afforded "a complete, permanent and effective bond of protection from excessive rates and charges," Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959), competition looms more important now than ever before.
 
 
 15
 In large part, the requisite competition will not be among gas pipelines, for it is the very essence of their monopoly power that alternative gas transportation options are unavailable to the great majority of their customers. Rather, as FERC recognized in Tennessee Gas Pipeline, 21 F.E.R.C. at 61,009, pipelines will be induced to keep their rates reasonable only if they fear that otherwise they will lose customers positioned to switch to alternative, cheaper fuels. Most of the pipelines' customers are not positioned to switch--in particular, LDCs and the residential customers they serve cannot readily convert to alternative fuels. But many of the largest industrial end users can shift, and pipelines, as sellers of gas, cannot lawfully lower prices to these customers without lowering prices to all. See, e.g., Transcontinental Gas Pipe Line Corp., 28 F.P.C. 979, 983 (1962) (refusing to approve "patently discriminatory and singularly preferential" discount rates); Otter Tail Power Co., 2 F.P.C. 134, 145 (1940) (utility regulation is designed to prevent the use of monopoly power to "discriminate against customers in a weak bargaining position").
 
 
 16
 Enter Order Nos. 319 and 234-B. MPC argues that these measures facilitate price discrimination and thereby effectively eliminate the competitive check on gas prices apparently contemplated by Tennessee Gas Pipeline.[11] Under blanket certification, pipelines can transport producers' reasonably priced gas to fuel-switchable end users, thus dissuading those users from leaving the gas market, while refusing to provide the same service to--and instead continuing to collect monopoly rents from--captive customers. Rather than contributing to a gradual across-the-board reduction in gas prices, MPC insists, the restyled blanket certificate transportation authority serves as a safety valve through which pipelines may from time to time bleed off accumulated competitive pressures. In short, MPC charges, FERC has "order[ed] the ideal pricing tool for a profit-maximizing monopolist." Brief of Petitioner Maryland People's Counsel at 43. Only by conditioning blanket certificates on the non-discriminatory provision of service to captive and non-captive consumers alike, MPC maintains, can FERC permit transportation of direct-sale gas to fuel-switchable end users without consigning other consumers to exploitation at the hands of interstate pipelines.
 
 
 17
 In Order No. 319-A, "Granting in Part and Denying in Part Applications for Rehearing of Order Nos. 319 and 234-B," FERC did not respond to these arguments; the Commission simply reiterated its belief that the blanket certificate program would benefit all segments of the gas market. See 48 Fed.Reg. at 51,438. MPC has petitioned this court for review.[12]
 
 II.
 
 18
 Our review is controlled by the considerations that guided the court in MPC I, 761 F.2d 774, 779. We do not "substitute [our] judgment for that of the agency," Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), but we do inspect to determine "whether the [administrator's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Id., 103 S.Ct. at 2867 (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); see Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373 (1968). Inspection convinces us that highly relevant factors, underscored by MPC,[13] have been brushed aside without warrant by the Commission. We therefore return this matter to the agency for the focused inquiry thus far avoided--an inquiry into the impact of the Commission's enlarged and restyled blanket certificate program on the customers most vulnerable to pipeline monopoly power.
 
 
 19
 Antitrust policy surely is a factor relevant to responsible administration of the "public convenience and necessity" standard under section 7 of the NGA. See Northern Natural Gas Co. v. FPC, 399 F.2d 953, 958 (D.C.Cir.1968) ("Although the Commission is not bound by the dictates of the antitrust laws, it is clear that antitrust concepts are intimately involved in a determination of what action is in the public interest, and therefore the Commission is obliged to weigh antitrust policy."); see also Tenneco Oil Co., 26 F.E.R.C. at 61,069 (FERC must weigh competitive concerns even if no party raises them). A paramount aspect of this policy is promotion of "the most efficient allocation of resources possible"--an objective vitally served by the "avoid[ance of] monopoly profits." Northern Natural Gas, 399 F.2d at 959.
 
 
 20
 MPC maintains that by insulating pipelines from the full shock of competition with suppliers of alternative fuels, the blanket certificate program will entrench the pipelines' power to extract monopoly profits. This argument merits serious attention. Cf. P. AREEDA, ANTITRUST ANALYSIS p 428 (3d ed. 1981) (if monopolist would profit more by uniformly lowering his prices than by selling only at inflated rates to those who value his product most, the availability of a third alternative--price discrimination--will be "socially ... harmful"). Order Nos. 319 and 234-B, however, shy away from indications that they may operate to perpetuate the collection of monopoly rents from captive consumers;[14] Order No. 319-A, the order on rehearing, is similarly retiring despite an MPC rehearing petition, see supra p. 784, urgently posing the issue. FERC's avoidance of the antitrust implications of its blanket certificate orders is particularly puzzling in light of the Commission's prior and subsequent recognition of the importance of questions of the kind MPC placed before the agency. See, e.g., Tenneco Oil Co., 26 F.E.R.C. at 61,068 ("At the outset we are obliged to acknowledge the substantial nature of the competitive concerns [generated by express prohibitions of direct sales to captive consumers]."); Tennessee Gas Pipeline, 21 F.E.R.C. at 61,009 ("[R]ate structures should not insulate an interstate pipeline from the consequences of its management decisions while keeping distributor customers and end-users at risk, and should provide mechanisms to ensure just and reasonable rates consistent with continued maintenance of service.").
 
 
 21
 To justify the omission, FERC and various intervenors now contend that pleas about anticompetitive effects are premature. The blanket certificate orders themselves are facially neutral; they do not command differential service.[15] If price discrimination is fostered, so this argument goes, the discrimination will indicate an abuse of the authority granted in the orders. Abuses, should they eventuate, may be dealt with in FERC ratemaking proceedings or in antitrust suits. See, e.g., Brief of Intervenors Process Gas Consumers Group and American Iron and Steel Institute at 19. We do not agree that the issue is safely deferred to another day and forum.
 
 
 22
 "Consideration of antitrust and anticompetitive issues by the Commission ... serves the important function of establishing a first line of defense against those competitive practices that might later be the subject of antitrust proceedings." Gulf States Utilities Co. v. FPC, 411 U.S. 747, 760, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973) (construing public interest standard under Federal Power Act); see also Atlantic Refining Co., 360 U.S. at 389, 79 S.Ct. at 1254 ("In view of [the delay inherent in subsequent Commission proceedings], the initial certificating of a proposal under Sec. 7[ ] of the Act as being required by the public convenience and necessity becomes crucial."); Public Systems v. FERC, 606 F.2d 973, 983 (D.C.Cir.1979) (FERC cannot simply defer consideration of anticompetitive effects till the adjudication of specific cases without stating its rationale for doing so). "Later" rather than "sooner" seems dubious counsel given the incentive pipelines have to pursue transportation policies that discriminate in favor of fuel-switchable end users. See Means & Angyal, The Regulation and Future Role of Direct Producer Sales, 5 ENERGY L.J. 1, 43 (1984).[16]
 
 
 23
 Moreover, we note that FERC has already dismissed specific charges of preferential access to transportation raised "later" in a ratemaking proceeding. Dissonant with its current "not ripe yet" contention, FERC disposed of the charges as impermissible "collateral attacks on Order Nos. 319 and 234-B." Columbia Gas Transmission Corp., 25 F.E.R.C. p 61,265, at 61,652 (Nov. 18, 1983); see also id. at 61,651 ("Our orders ... only describe the maximum limits of these programs. They do not require participating pipelines to structure their transportation programs as broadly."). The Commission, it thus appears, expected players in the natural gas field to recognize "sooner" rather than "later" that the blanket certificate orders did indeed clear an area for discrimination against captive customers.[17] Based upon court precedent and agency practice, we hold that the Commission should have considered the anticompetitive effects of the reshaped blanket certificate program before the orders were promulgated. The reasonableness of FERC's failure to make such an inquiry, we thus conclude, is a matter fully ripe for judicial review.
 
 
 24
 The closest the challenged orders come to addressing the competitive concerns advanced by MPC is a passage in Order No. 319-A prefaced by the statement that "the Commission is not convinced by the applicants' unsupported arguments that some distributors' residential and commercial customers will be harmed." 48 Fed.Reg. at 51,438. FERC gave three reasons why, confronted with MPC's rehearing application, it remained unconvinced.
 
 
 25
 (1) "To the extent the program results in direct sales of gas to purchasers who would otherwise switch to alternative fuels," FERC posited, "those end-users will continue to bear some of the fixed costs of the transporting pipeline, thereby benefitting the pipeline's other customers." Id. Mirroring the situation in MPC I, 761 F.2d at 775, the Commission presents its fixed-cost-savings rationale without disclosing why it believes such benefits would not accrue if blanket transportation authority were conditioned on nondiscriminatory service to captive consumers and fuel-switchable end users alike. Nor has the Commission offered a cogent answer to MPC's contention that fixed-cost savings "are insignificant when compared to the benefits [captive] customers could realize by being allowed to participate in spot market transactions." DOE REPORT, supra p. 781, at 76; see MPC I, 761 F.2d at 776-77. The Commission perhaps anticipates that pipelines would reject transportation certificates made contingent on the provision of equal access to all customers. See id. at 775. If this is an accurate forecast, however, captive consumers need not be the losers, for FERC has previously intimated that it will disallow the recovery of additional fixed costs occasioned by a pipeline's obstinate refusal to heed market pressures. Columbia Gas Transmission Corp., 26 F.E.R.C. at 61,112; Tennessee Gas Pipeline, 21 F.E.R.C. at 61,009.
 
 
 26
 (2) "Direct sale arrangements under the blanket certificate program," FERC asserted, "also are likely to keep wellhead gas prices responsive to reductions in the burner-tip price of other fuels by insuring that price competition from competing fuels will actually be felt at gas wellheads." 48 Fed.Reg. at 51,438. We discern in this observation no clear reason for allowing pipelines with idle capacity simply to favor their most fortunate customers. And if, in the absence of a license to discriminate, pipelines refuse to transport direct-sale gas to anyone, the result will presumably be still greater surpluses of gas at the wellhead--the clearest possible signal to producers that their long-term contract prices are too high.
 
 
 27
 (3) Finally, the Commission stated:
 
 
 28
 Another important objective of the blanket certificate program is to create an incentive for pipelines to adopt gas purchasing practices which keep their delivered prices competitive. This incentive will arise as a consequence of end-users' having increased opportunities to purchase gas from sources other than the system supply of a distributor or interstate pipeline.
 
 
 29
 Id. Given the state of the gas market, see supra pp. 784-85, we do not see what large incentive pipelines would have under the challenged transportation authority to keep the prices of their own "system supply" gas competitive, as long as they could satisfy the needs of their fuel-switchable customers through transportation of direct-sale gas and "special marketing programs," see MPC I. Explaining the Commission's position at oral argument, FERC's counsel suggested that transportation to noncaptive customers would spotlight a "reference point" price that would, by example, lead to a drop in all gas prices. This Delphian scenario is one we could barely perceive; it suffices to comment that the mechanism by which the drop would come about has not been adequately described.
 
 
 30
 Even if each of the Commission's tersely recited points (as well as FERC's earlier, hopeful comment that the orders "should provide some stimulus to the exploration and development of long-term domestic gas reserves," 48 Fed.Reg. at 34,873) impressed a reasonable mind, FERC's supports for the current blanket certificate program would still fail to cohere into a direct response to the price discrimination concerns MPC presented. The enlargement of transportation authority may well do some good for the gas market, but the crucial question--one the Commission left unaddressed--is whether the program FERC approved will do "more good than harm." MPC I, 761 F.2d at 779.
 
 III.
 
 31
 In its oversight of the natural gas market, FERC confronts baffling problems. It must administer a pair of statutes that sometimes seem at cross-purposes; it must seek out the elusive optimal mix of competition and regulation; and whatever it does, it subjects itself to the slings and arrows of outraged producers or pipelines or LDCs or consumers. Appreciating that the Commission has an arduous task, we are nonetheless obliged to conclude that FERC has not discharged that task satisfactorily in the present case.
 
 
 32
 On remand, FERC should fully consider and reasonably analyze the competitive concerns advanced here by MPC. We vacate the challenged orders[18] to the extent that they allow transportation of direct-sale gas to fuel-switchable, non-"high-priority" end users without requiring pipelines to furnish the same service to LDCs and captive consumers on nondiscriminatory terms.[19]
 
 
 33
 Petition granted.
 
 
 
 [1]
 In MPC I, we invalidated as arbitrary and capricious FERC's authorization of a "special marketing program" under which a pipeline and its producer agreed to "amend the high-priced gas purchase contracts entered into between them in earlier years, so as to permit the producers to sell the committed gas elsewhere (at current market prices), crediting the volume of such sales against the pipeline's high-priced purchase obligations." MPC I, 761 F.2d at 770. We held that FERC had failed to set forth a reasonable basis for its decision to exclude "captive customers" from eligibility to purchase the cheaper released gas
 The regulatory and market condition context of these cases, as summarized in MPC I, id. at 770-71, sets the stage for both opinions. See also Maryland People's Counsel v. FERC, 760 F.2d 318 (D.C.Cir.1985) (finding that Maryland People's Counsel has standing to sue FERC in federal court); Consolidated Edison Co. v. FERC, 757 F.2d 1328 (D.C.Cir.1985) (dismissing as moot a challenge to FERC's authorization of an "additional incentive charge" for the transportation of gas to end users).
 
 
 [2]
 See generally N. CLARK & G. CLARK, GOVERNMENTS, MARKETS AND GAS (1984); Pierce, Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry, 97 HARV.L.REV. 345 (1983)
 
 
 [3]
 This report, we noted in MPC I, 761 F.2d at 777 n. 8, was released after the Commission's action here; we cite it as we might cite any recently published relevant work from a responsible source
 
 
 [4]
 Order No. 234-B, 48 Fed.Reg. 34,872 (1983) (codified at 18 C.F.R. Sec. 157.209(e) (1984)); Order No. 319, 48 Fed.Reg. 34,875 (1983) (codified in relevant part at 18 C.F.R. Secs. 157.202, .209 (1984)); Order No. 319-A, 48 Fed.Reg. 51,436 (1983) (codified in relevant part at 18 C.F.R. Sec. 157.209 (1984))
 
 
 [5]
 The Commission acted pursuant to Sec. 7(c)(2) of the Natural Gas Act of 1938 (NGA), 15 U.S.C. Sec. 717f(c)(2) (1982). Added to the NGA by Sec. 608 of the Public Utilities Regulatory Policies Act of 1978, Pub.L. No. 95-617, 92 Stat. 3117, 3173, Sec. 7(c)(2) provides:
 The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--
 (A) natural gas sold by the producer to such person; and
 (B) natural gas produced by such person.
 
 
 [6]
 In a notice issued March 22, 1985, FERC proposed to extend the duration of this aspect of the "blanket certificate" program from the originally stated expiration date of July 1, 1985, until December 31, 1985. 50 Fed.Reg. 12,326 (1985)
 
 
 [7]
 Categories of gas removed from FERC price-setting jurisdiction were placed under a price ceilings regime that, in the case of recently developed gas, is phasing out:
 The price ceilings are scheduled to be removed between 1985 and 1987 from categories of gas that will account for over one-half of the total gas supply. The impact of the price ceilings that remain in effect after 1987 will gradually lessen, because the normal decline in yield from old reservoirs will ensure that supplies of old regulated gas account for a constantly diminishing share of the aggregate national gas supply.
 Pierce, supra note 2, at 348-49 (footnote omitted); see, e.g., 15 U.S.C. Sec. 3331(c) (1982).
 
 
 [8]
 The sale itself is not a "sale for resale" and may therefore take place without FERC approval. See 15 U.S.C. Sec. 717(b) (1982)
 
 
 [9]
 Eligibility is limited to gas supplies not "committed or dedicated to interstate commerce on November 8, 1978." 48 Fed.Reg. at 51,439; cf. MPC I (special marketing program largely for "old" gas)
 
 
 [10]
 MPC did not participate in the rulemaking out of which Order Nos. 319 and 234-B emerged--assertedly because the relevant notices of proposed rulemaking did not even remotely allude to the possibility that FERC would include fuel-switchable end users in the blanket certificate program. MPC assigns deficient notice as one of several grounds for reversing the Commission's orders. See, e.g., Brief of Petitioner Maryland People's Counsel at 65-71. In view of our decision on the merits of MPC's substantive challenge, we do not reach the notice issue
 
 
 [11]
 [A]s a result of Tennessee's gas purchasing practices, Tennessee's sales price charged to its distributor customers [may be] so high as to cause large industrial users to switch to alternative fuels.... Hence, ... interstate pipelines ... should have a vital interest in assuring that the price of gas to end-users remains at marketable levels
 Tennessee Gas Pipeline, 21 F.E.R.C. at 61,009. Because this passage refers to a situation in which pipelines sell only to LDCs rather than to LDCs and end users, the Commission could not have meant that pipelines would be able to keep fuel-switchable customers on the system by selling competitively priced gas solely to those customers.
 
 
 [12]
 We consolidated this case with Consolidated Edison Co. v. FERC, 757 F.2d 1328 (D.C.Cir.1985). Consolidated Edison was a challenge by an LDC to another aspect of Order No. 319--FERC's grant of authority to pipelines to collect an "additional incentive charge" (AIC) of five cents per MMBtu for transporting direct-sale gas to end users. Since this charge was five cents more than the surcharge allowed for transportation of gas to LDCs, the petitioner urged that the AIC program unlawfully discriminated against LDCs by inducing pipelines to transport gas to end users rather than to LDCs whenever pipeline capacity was insufficient to permit transportation to both. We held the petition moot, because the AIC "experiment" had expired on January 31, 1985, and FERC's determination to review all arguments for and against an AIC before reinstituting such a program promised essentially what the petitioner sought
 
 
 [13]
 MPC's assessment of the FERC orders' impact might be questioned as overblown. All the orders permit is unscrutinized transportation of gas to fuel-switchable end users for 120 days. Further authorization is subject to "notice and protest," see supra p. 783; and although a proposal under this regime is presumed to serve the public convenience and necessity until objected to, any objection filed and not withdrawn converts the notice-and-protest procedure into a regular NGA Sec. 7 proceeding. See 18 C.F.R. Sec. 157.205 (1984). But MPC contends, tenably, that protest against extension of the 120-day period will almost always prove bootless. As support for this forecast, MPC notes, inter alia, the express exclusion of captive customers from the full benefits of "special marketing programs." See MPC I
 
 
 [14]
 MPC therefore contends that FERC has disregarded its obligation to refrain from issuing a permanent certificate under Sec. 7 of the NGA until it has found, on the basis of substantial evidence, that consumers will not suffer unjustified rate increases as a result. See Atlantic Ref. Co. v. Public Serv. Comm'n, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); cf. Consumer Fed'n of Am. v. FPC, 515 F.2d 347, 357 (D.C.Cir.) (Commission approval under Sec. 7 that "ignore[s] impact of [proposed action] on price levels ... constitute[s] impermissible deregulation"), cert. denied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975)
 
 
 [15]
 On the contrary, FERC and the intervenors point out, pipelines are eligible for only 120 days of self-implementing authority to transport gas to fuel-switchable end users; transportation to LDCs may proceed without hindrance for two years. Cf. MPC I (express prohibition of sales to captive consumers)
 
 
 [16]
 We note FERC's related argument that LDCs--as the practical representatives of all their captive customers, and as indispensable links in the chain of distribution from producer to end user--may foil transportation arrangements that would ultimately harm captives. See, e.g., Brief for Respondent Federal Energy Regulatory Commission at 43-44. Even if it would be in any particular LDC's interest to forego transportation revenues without assurance that other LDCs would do the same, and even if state law permitted the LDC to engage in the suggested refusal to serve, that "self-help" prospect should not relieve FERC of its obligation, as protector of consumer interests, to consider promptly the impact of discriminatory transportation on captives
 
 
 [17]
 FERC later recognized that LDCs and end users had "raised serious questions regarding the availability of transportation services" under Columbia Gas Transmission Corporation's allegedly discriminatory tariffs. Columbia Gas Transmission Corp., 26 F.E.R.C. p 61,169, at 61,418 (Feb. 10, 1984). Those questions were set for oral argument on March 7, 1984. Id. As of this writing, some 21 months after the effective date of the tariffs, FERC has yet to announce its decision
 
 
 [18]
 FERC contends that the challenged orders are entitled to indulgent review because they are "experimental," 48 Fed.Reg. at 34,873. As indicated in MPC I, 761 F.2d at 778-79, we must resist this argument when it is not attended by any articulation in response to the serious objections MPC presses. One facet of the trial nature of the Commission's program, however, does ease our path. While we vacate the disputed portions of the orders, we do not disturb settled expectations: an experiment scheduled to terminate on July 1 of this year could not have engendered heavy reliance interests
 
 
 [19]
 MPC's plea that blanket transportation certificates be conditioned on nondiscriminatory access accords with the recommendation of the Department of Energy: "To achieve the benefits of a properly developed spot market for natural gas," "FERC should use its authority over natural gas transportation to require pipeline companies to provide carriage on a nondiscriminatory basis whenever there is idle pipeline capacity." DOE REPORT, supra p. 781, at 82. FERC does not question that it has such authority. See Tennessee Gas Pipeline Co. v. FERC, 689 F.2d 212, 214-15 (D.C.Cir.1982); Transcontinental Gas Pipe Line Corp. v. FERC, 589 F.2d 186, 190 (5th Cir.1979) (invoking "the well-established principle that generally the Commission has extremely broad authority to condition certificates of public convenience and necessity"), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); 15 U.S.C. Sec. 717f(e) (1982)